STATE OF TENNESSEE *v.* J. A. HALL.[*]

(*Nashville,* December Term, 1931.)

Opinion filed July 2, 1932.

---

[*]As to statute giving commissioners of game right of search and seizure, see 11 R. C. L., 1056.

As to validity and construction of game laws, see 12 R. C. L., 691, 692; R. C. L. Perm. Supp., p. 3167; R. C. L. Pocket Part, title Game Laws, section 9.

NAT TIPTON, Assistant Attorney-General, for plaintiff in error.

C. C. JACKSON, for defendant in error.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

The defendant was presented for violating chapter 51, section 7, Public Acts of 1931 (the general fish and game law), which is as follows:

"That the State Game Warden or the deputy game warden shall enforce all laws now enacted or that may be enacted for the protection, propagation and preservation of all wild animals, wild fowls, wild birds and fishes in this State, and shall prosecute all persons, firms, and corporations who shall violate any of such laws and he shall by himself or by his deputy game wardens seize any and all wild animals, wild fowls, wild birds and fishes or parts thereof that have been killed, caught, or taken at a time, in a manner, or for a purpose, or in possession, or that have been shipped, transported, carried or taken contrary to the game laws of this State.

"*Provided further,* it is hereby made the duty of every person participating in the privileges of taking or possessing wild animals, wild birds, wild fowl and fish as permitted by this Act to permit the State Game Warden

or his deputy game wardens to inspect and count such wild animals, wild birds, wild fowls and fish to ascertain whether the requirements of this Article are being faithfully complied with. Any person who shall refuse to comply with a demand to permit such inspection and count by any authorized officer of the State, or who shall interfere with such officer, or obstruct such inspection or count shall be guilty of a misdemeanor, and upon conviction be punished by a fine of not less than Ten ($10.00) nor more than Twenty-five Dollars ($25.00.) ''

Upon motion the trial court quashed the presentment, on the ground that it violated the search and seizure provision of the constitution. The constitution does not prohibit searches in general, but only those that are unreasonable.

It will be observed that the Act does not specifically authorize the search of the person of the huntsman, nor of his hunting bag, nor receptacle containing his fish, but simply authorizes an inspection and count of his kill or catch to see that he has not exceeded the limit fixed in the statute, and makes it a misdemeanor to refuse or to obstruct such inspection.

In 12 Ruling Case Law, 691-692, it is said:

''There is no dissent from the general proposition that the state has the authority to make regulations tending to conserve the game within its jurisdiction. This power of the state is based largely on the circumstance that the property right to the wild game within its borders is vested in the people of the state in their sovereign capacity; and, as an exercise of its police powers and to protect its property for the benefit of its citizens, it is not only the right but it is the duty of the state to take

such steps as shall preserve the game from the greed of hunters.''

In *Lacoste* v. *Department of Conservation,* 263 U. S., 545, 549, 68 L. Ed., 437, 439, the court said:

''The wild animals within its borders are, so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power, the state may regulate and control the taking, subsequent use, and property rights that may be acquired therein.''

This Court, in *State* v. *Ashman,* 123 Tenn., 654, 657, said:

''The common law vests the title of game and fish, not reduced to possession or under restraint, in the sovereign power—in Great Britain, in the King; in the United States, the several states, in trust for their inhabitants. No one has any absolute property right in game or fish while in a state of nature and at large, and the right to take them may be restricted or prohibited, and, when granted or exercised, it is a privilege.''

This being true, we see no reason why the State may not annex to this privilege any condition and limitation it sees fit. If the sportsman is unwilling to avail himself of the privilege accorded him, upon the terms and provisions prescribed, he may decline the invitation, but he cannot enjoy the benefits of this Act without submitting to its burdens and restrictions.

The following provisions of the Federal Code, under the title ''Customs Duties,'' involve the same principle:

368. ''The collector may cause an examination to be made of the baggage of any person arriving in the United States in order to ascertain what articles are

contained therein and whether subject to duty, free of duty, or prohibited notwithstanding a declaration and entry therefor has been made.''

484. ''The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.''

These statutes have been in effect since 1866, yet, so far as we have been able to ascertain, the right to search thereunder has never been questioned, and could not be, since it is provided by the Federal Code that it shall ''be unlawful for any citizen of the United States to depart from or enter or attempt to depart from or enter the United States unless he bears a valid passport.'' Code, section 224, page 658. So that in accepting a passport the citizen does so subject to the Customs Statutes of search and inspection, and impliedly waives the constitutional inhibition against unreasonable searches.

In 56 Corpus Juris, pages 1178-1179, it is said: ''The constitutional immunity from unreasonable searches and seizures, being a personal privilege, may be waived, as by a voluntary invitation or consent to a search or seizure. Thus individuals may waive their immunity to illegal searches of their persons, possessions, dwelling houses, as well as to the illegal search of their premises, or places of business.''

On pages 1179-1180 the following rule is announced: ''The constitutional immunity is sometimes waived by a person when he engages in a business which is regulated

by law, the acceptance of a license to engage in such a business being a necessary acceptation of the statutory conditions and an implied waiver of the constitutional immunity to that extent."

In *U. S.* v. *Mulligan,* 268 Fed., 893, it was held that under the Lever Act a person by accepting the conditions under which licenses were granted to deal in food, feeds, fuel, etc., and regulating the keeping of accounts with provision for the inspection thereof, is deemed to have waived the constitutional right to prevent such inspection which he would otherwise have had.

In *U. S.* v. *Hilsinger,* 284 Fed., 585, the court held that under a statute authorizing an inspector "to enter, in the daytime, any brewery, distillery, manufactory or place where any property, articles or objects subject to duty or tax under the act are made, produced or kept," for the purpose of examining same, was not a violation of the constitution. In the opinion the court said: "It is thought that when one avowedly goes into the business of producing such articles, registers his manufactory with the collector of internal revenue, then it becomes subject and he subjects it to the provisions and terms of the statute.

In *Paladini* v. *Superior Court,* 178 Cal., 369, there was involved the right to inspect the books of Paladini, a fish dealer, to determine whether he had violated the law. The act under consideration provided for the licensing of fishermen and those who sell fish, and authorized the state market director to fix wholesale and retail prices of fish, and further provided for the inspection of the books of dealers, to ascertain whether they were complying with the statute. In holding the act valid and not in contravention of the search and seizure pro-

vision of the constitution, the court said: "The petitioner by engaging in the business of dealing in fish caught in the waters of the state, in effect consented to the inspection of their books by the state market director, as in the law provided."

In *Wibmer* v. *State,* 182 Wis., 303, it was held that the acceptance of a license to sell nonintoxicating liquors issued under statute, is an acceptance of the statutory conditions as to inspection by police or prohibition officers of the premises upon which the nonintoxicating liquors are kept. Says the court: "The acceptance of the license is necessarily an acceptance of the accompanying statutory conditions, and as to the premises is an implied waiver of the search and seizure provision of the constitution."

It may be said generally that inspection laws, enacted under the police power of the State, have been sustained by the courts. *State* v. *Legora,* 162 Tenn., 122; *State ex rel.* v. *Nolan,* 161 Tenn., 293.

The statute here involved is a salutary one, looking to the preservation of the fish and game of the State. No true sportsman will object to its requirements, while the "game hog" should be compelled to obey its mandates. We see no reason why one who has not violated this law should object to an inspection any more so than one engaged in selling tobacco should object to having his store inspected for the purpose of ascertaining whether he is violating the tobacco statute, or one returning from a European tour should object to opening his baggage for inspection so that the Government might ascertain whether there is contained therein any dutiable goods.

Being of opinion that the statute is valid, its results in a reversal of the trial court and a remandment of the case for a hearing upon the merits.