STATE OF IOWA, appellee, v. SARAH E. THOMPSON SHEPHARD, appellant.

No. 50987.

(Reported in 124 N.W.2d 712)

November 12, 1963.

Rehearing Denied January 14, 1964.

William C. Starke, of Chicago, Illinois, and Alvin Hayes, Jr., of Sioux City, for appellant.

Evan Hultman, Attorney General, John H. Allen, Assistant Attorney General, and Edward F. Samore, Woodbury County Attorney, for appellee.

STUART, J.—Defendant was convicted of murder in the second degree in connection with the death of her newborn child. She has appealed and assigns these errors: (1) failure to suppress evidence and testimony secured by virtue of an illegal search and seizure; (2) failure to suppress evidence of certain conversations between defendant and the medical examiner; (3) admission into evidence of the medical examiner's report; (4) failure to sustain defendant's motion for a bill of particulars; (5) failure to sustain defendant's objections to certain instructions; (6) refusal to give a requested instruction cautioning the jury that the law applies equally to colored and white; (7) failure to sustain a motion for acquittal or new trial on the ground that the State failed to prove its case beyond a reasonable doubt. The facts will be stated as they become pertinent.

I. Prior to the trial, defendant filed a motion to suppress evidence obtained by a search and seizure of "property, things and information" in her home in Sioux City on the ground the search was illegal and in violation of her rights guaranteed by the 4th and 14th Amendments to the Constitution of the United States and the Constitution of Iowa. Evidence was taken as to the circumstances surrounding the search. The trial court overruled the motion to suppress the exhibits obtained in the search and the testimony of the officers making the search. They were introduced at the trial without further objection from defendant.

Defendant argues that evidence obtained during an illegal search is not admissible at the time of trial where a timely motion to suppress the evidence has been filed. She cites Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed.2d 1081, 84 A. L. R.2d 933, in which the Supreme Court of the United States

held the due process clause of the 14th Amendment precluded the admission of unconstitutionally seized evidence in a State proceeding. For an interesting discussion of the Mapp case and the increasing involvement of the Supreme Court in the State administration of criminal law see 49 Iowa Law Review 14.

The State does not quarrel with the pronouncements of the Mapp case, nor does it claim that a warrant was issued or that the search was in connection with an arrest. The State claims the protection afforded by the 4th and 14th Amendments to the Constitution was waived when the husband of the defendant consented to the search. It is well settled that one may freely consent to a search. State v. Post (1963), 255 Iowa 573, 581, 123 N.W.2d 11, 16; Foley v. Utterback, 196 Iowa 956, 195 N.W. 721. We must determine first, whether the facts in the instant case support a finding that the husband did freely and voluntarily give his consent to the search and seizure without "implied coercion". If we determine the consent was voluntary, we must then decide whether a husband under these circumstances can voluntarily waive his wife's constitutional guarantees to the right of privacy.

The burden of demonstrating that evidence has been illegally procured normally devolves upon the accused in a motion to suppress such evidence. Rigby v. United States, 101 App. D. C. 178, 247 F.2d 584; Watson v. United States, 101 App. D. C. 350, 249 F.2d 106. See also Wilson v. United States, 218 F.2d 754; United States v. Lipshitz, 132 F. Supp. 519. However, where the government relies upon consent to an otherwise illegal search and seizure, it has the burden of proving by clear and convincing evidence that the consent was voluntary and free from duress and coercion. Rigby v. United States and Watson v. United States, both supra; Nelson v. United States, 93 App. D. C. 14, 208 F.2d 505; Kovach v. United States, 53 F.2d 639.

It is for the trier of fact to determine whether the consent was voluntary or coerced. The evidence in this instance must be viewed in the light most favorable to the State. We are to determine if the evidence so considered is sufficient to

support the trial court's finding that Mr. Shephard gave his consent freely and voluntarily.

The Illinois Supreme Court considered this specific problem in People v. Speice, 23 Ill.2d 40, 44, 177 N.E.2d 233, 235, in which defendant claimed the consent of the wife was not freely given but was the result of implied coercion on the part of police officers. "In support of this contention the defendant relies strongly upon Amos v. United States, 255 U. S. 313 [41 S. Ct. 266], 65 L. Ed. 654, and People v. Lind, 370 Ill. 131 [18 N.E.2d 189.] In these cases it was held that the circumstances showed that the consent of the wife was not freely given but was the result of implied coercion brought about by the presence of the police officers. In both of these cases there was a conflict in the testimony as to whether the wife in fact consented. The defendant points out that there is such a conflict in the present case and argues that because of this conflict in the testimony this case should be covered by Lind and Amos rather than Shambley and Perroni, for in the latter cases there was no conflict in the testimony as to the consent. This argument would have the effect of taking from the trial judge the right to pass upon the credibility of the testimony and would require us to hold that in the event of a conflict in the testimony as to whether consent was given we must decide that the consent was not freely given. * * * The question of whether consent was in fact given is a factual matter to be determined by the trial court and where the evidence is conflicting this court will accept the finding of the trial court unless it is clearly unreasonable."

As the determination is one of fact, each case must be decided upon its own circumstances. Although precedents are of little value, the following cases hold under the facts therein that consent was freely and voluntarily given. Crawford v. United States, 219 F.2d 207; People v. Faulkner, 166 Cal. App.2d 446, 333 P.2d 251; State v. Post, 255 Iowa 573, 581, 123 N.W.2d 11, 16; State v. Hall, 164 Tenn. 548, 51 S.W.2d 851; Watson v. United States, 101 App. D. C. 350, 249 F.2d 106; Nelson v. United States, 93 App. D. C. 14, 208 F.2d 505; Kovach v. United States, 53 F.2d 639; People v. Stacey, 25

Ill.2d 258, 184 N.E.2d 866; People v. Speice, 23 Ill.2d 40, 177 N.E.2d 233.

In the following instances it was held that there was implied coercion which tainted the consent. Amos v. United States, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654; Channel v. United States (1960), 285 F.2d 217; Judd v. United States, 89 App. D. C. 64, 190 F.2d 649; Waldron v. United States, 95 App. D. C. 66, 219 F.2d 37; United States v. Marquette, 271 F. 120; Cofer v. United States, 37 F.2d 677; Fitter v. United States, 258 F. 567.

The evidence in the instant case supports the following findings of fact:

Defendant, her husband and their children at all times material here were residing together and jointly occupying a rented apartment in Sioux City. On December 15, 1961, she was taken to St. Joseph Mercy Hospital in a weakened condition from vaginal bleeding. Upon being questioned by officers of the law while in the hospital, she admitted giving birth to a baby the night before and claimed she had given it to a man named George. About 10 a.m. the next day three police officers went to the apartment occupied by defendant and her husband to find out what Mr. Shephard knew about the man named George. It is conceded the officers had no search warrant and were not at the premises to make an arrest.

Mr. Shephard met the officers in the hallway outside of his apartment. On being told who they were, he invited them into his apartment. Mr. Shephard talked very freely but denied any knowledge of the person his wife said had been given the baby. He denied knowledge of the birth of the baby but said his wife told him "she had passed something".

Officer Wm. A. Dennison testified: "Before we decided to leave the house I told Mr. Shephard that under the circumstances as long as he had not made a thorough search I thought it would be a mighty good idea if we would search the house to see if this baby that was missing might be hidden in the house some place, closet, dresser drawers or most anywhere where a small package could be. He said, 'I have no objections, okay.'

He got up off where he was sitting and started showing us different rooms in the house."

Mr. Shephard accompanied the officers on the search and "opened the closet door, took down suitcases and hatboxes and all kinds of different kinds of boxes that were stored up in the closet, opened them up, he looked in the dresser drawers and emptied some suitcases out on the floor that had clothing in them, and finally he looked under the baby crib where there was a suitcase slid in under the baby crib and he said, 'Well, here is one, a suitcase that we haven't looked at', and he had to raise the baby crib up a couple inches to slide the suitcase out from under it, and he pulled this in the middle of the floor and he knelt down and opened the suitcase and started taking pieces of clothing out of this suitcase * * *."

It was in this suitcase the body of the child and other evidence sought to be suppressed was found.

Although Mr. Shephard denied the degree of cooperation and participation testified to by the officers, he generally supports their testimony. He denies specific consent to the search, but does not claim to have made any objection. There is no claim of any threats of force or display of arms. Later in the week Mr. Shephard brought a pair of scissors he found in the apartment to Officer Dennison. Officer Dennison also testified that after the baby was found Mr. Shephard said that if he had any idea the "baby was in the house he wouldn't have stayed there the night before, he would have had somebody come and look it over."

This evidence is sufficient to support the trial court's finding that Mr. Shephard gave his free and voluntary consent to the search. The elements which had been held to be coercive in cases cited above are totally absent. There were no threats, display of arms or statements they had come to make a search. Mr. Shephard was not arrested and in no fear of being arrested. He knew nothing about the presence of the child's body. There was no reason why his stated consent and voluntary participation should be considered "an act of bravado" of a guilty person rather than a free and voluntary consent.

II. Very few cases have considered the right of a husband to waive his wife's constitutional guarantees. Bannister v. State (1929), 112 Tex. Crim. 158, 15 S.W.2d 629; Jones v. State (1946), 83 Okla. Crim. 358, 177 P.2d 148, hold the husband may waive the wife's rights. People v. Weaver (1928), 241 Mich. 616, 217 N.W. 797, 58 A. L. R. 733, is not in point as the husband and wife were not living together and she was seeking a divorce. The alleged consent was a written waiver executed by the husband two years before as a condition of his probation.

Jones v. United States, 362 U. S. 257, 261, 80 S. Ct. 725, 731, 4 L. Ed.2d 697, 702, 78 A. L. R.2d 233, 239, considered who may attack an illegal search and seizure. It is followed by an extensive and comprehensive annotation on the subject. The opinion states:

"As a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. Rule 41e applies the general principle that a party will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.' [New York ex rel.] Hatch v. Reardon, 204 U. S. 152, 160 [27 S. Ct. 188, 51 L. Ed. 415, 422, 9 Ann. Cas. 736]. The restrictions upon searches and seizures were obviously designed for protection against official invasion of privacy and the security of property. They are not exclusionary provisions against the admission of kinds of evidence deemed inherently unreliable or prejudicial. The exclusion in federal trials of evidence otherwise competent but gathered by federal officials in violation of the Fourth Amendment is a means for making effective the protection of privacy."

The 4th and 14th Amendments are not designed to help a guilty party escape the consequences of his act. Their purpose is to protect a person and his property from arbitrary and unreasonable searches and seizures. It is the "right of privacy" that is protected. The fact that the invasion of this

right has on occasions resulted in the freeing of a party who might actually be guilty of crime is incidental. Therefore if the party who has possession or control of the premises and property voluntarily consents to a search, the right of privacy is not invaded and the fact the search may disclose evidence tending to incriminate an absent party who may have an equal right to possession or control does not affect the reasonableness or legality of the search. For a full discussion of the authority for another to consent to a search and seizure see annotation, 31 A. L. R.2d 1078.

This annotation cites several cases which discuss the right of the wife to waive the husband's constitutional rights to protection from unreasonable search and seizure. Many more are contained in the Blue Book of Supplemental Decisions. Some are in conflict but many can be reconciled on the facts. Some turn on the fact the husband is head of the household. The clearest and most reasonable test to determine whether a wife may consent to a search and seizure of the home is found in People v. Carter, 48 Cal.2d 737, 746, 312 P.2d 665, 670:

"When the husband is absent from the home, it is the wife who controls the premises, the ordinary household property, the automobile, and with her husband's tacit consent determines who shall and who shall not enter the house on business or pleasure and what property they may take away with them. When the usual amicable relations exist between husband and wife and the property seized is of a kind over which the wife normally exercises as much control as the husband, it is reasonable to conclude that she is in a position to consent to a search and seizure of the property in their home."

█ The same rule applies with equal force to the situation in which the husband has voluntarily consented to the search and seizure of property jointly controlled by the husband and wife. In fact, the consent of the husband should be more effective than that of the wife as he is ordinarily considered to be the head of the household. His control of the apartment searched in the instant case was clearly established. He paid the rent for the apartment and lived there with his wife and children as head of the household. He voluntarily consented to a search

of the apartment. He had a right to do so. The defendant's constitutional rights were not violated.

III. Defendant claims the trial court erred in admitting testimony of the medical examiner relating to conversations with her during his investigation as to the cause of death. She claims she was not informed of her right to refuse to testify, was not provided with counsel and was compelled to answer the questions asked by the medical examiner. Advice as to constitutional rights is not a prerequisite to the admissibility of voluntary inculpatory admissions. State v. Stump, 254 Iowa 1203, 119 N.W.2d 210; State v. Beltz, 225 Iowa 155, 279 N.W. 386. Furthermore, the first and third claims are not supported by the record.

At the hearing on the motion to suppress evidence, the defendant admitted that on two occasions the county attorney told her that anything she might say could be used against her. The county attorney, called as a witness by the defendant at the same hearing, testified he admonished her on two or three different occasions. These instances occurred the day before the medical examiner made his investigation.

There is no support for the claim the defendant was compelled to answer questions. The record shows she voluntarily consented to the questioning. Defendant's position seems to be that she was compelled to answer as this investigation was part of the medical examiner's official duties. The cases cited by defendant for this proposition are not in point. They all involve formal hearings at which defendant was called as a witness, placed under oath and required to answer. Information obtained in this fashion is clearly involuntary and was properly excluded when the witness was placed on trial. State v. Van Tassel, 103 Iowa 6, 72 N.W. 497, cited by the State, more closely parallels the facts in the instant case, even though it also involved a formal inquest. Defendant there appeared and voluntarily gave information at the inquest on his wife's death. Testimony of admissions made by the defendant at that hearing was admitted. In the instant case, the questions were answered voluntarily, there was no formal hearing and

no compulsion. She was not unlawfully compelled to give testimony against herself.

 Defendant complains because she was not provided counsel prior to the questioning by the medical examiner. There is no duty upon the State to provide counsel for a party during an investigation prior to arrest or detention. Section 755.17 of the 1962 Code of Iowa which specifies the duty to an accused after arrest or detention was not applicable. Even under the statute, there is no obligation to provide counsel. We say in State v. Tornquist, 254 Iowa 1135, 1151, 120 N.W.2d 483, 493:

"The statute says only 'permit'; it does not compel the authorities to require a person in custody to make a telephone call or ask that his family be notified or that he be permitted to consult with them. The choice is his, rather than that of the police or the family or the attorney. There is no showing here that the defendant attempted to exercise his rights under the statute, much less that any were denied him."

There was less reason for the State to provide counsel here than in the Tornquist case.

 IV. Defendant claims the court erred in admitting exhibit 7 which was the report of the county medical examiner. At the trial the objection was based upon hearsay. On appeal it is also contended the report contains "statements by witnesses or other persons and conclusions upon extraneous matters" which are not admissible under section 339.9, 1962 Code of Iowa, under which such reports are made admissible. The report discloses admissions of defendant as to the source of her pregnancy and the conclusions of the pathologist who performed the autopsy. The medical examiner was not present. These apparently are within the exclusions set forth in the statute. We need not decide, however, if they were properly objected to as the medical examiner testified fully on the stand as to defendant's admissions and the pathologist was also a witness. Both supported the evidence contained in the report. The witnesses were subjected to cross-examination. As the same facts were shown by the testimony of the witness who made the report and the pathologist who conducted the examination, the error was harmless and would not warrant a reversal. State v. Ma-

brey, 245 Iowa 428, 60 N.W.2d 889; State v. Stafford, 237 Iowa 780, 23 N.W.2d 832; State v. Leib, 198 Iowa 1315, 201 N.W. 29.

V. Defendant's fourth assignment of error is in overruling her motion for a bill of particulars. Under section 773.5 the defendant is entitled to a bill of particulars when the indictment and the attached minutes of the evidence are not sufficient to enable her to prepare her defense or fails to give her information she is entitled to under the Constitution. The motion is addressed to the sound discretion of the trial court and its ruling will not be reversed unless such discretion is abused. Hartzell v. United States, C. C. A., 1934, 72 F.2d 569, certiorari denied 293 U. S. 621, 55 S. Ct. 216, 79 L. Ed. 708; Pines v. United States, C. C. A., 1942, 123 F.2d 825.

The indictment and minutes together with the autopsy report received by the defendant contain sufficient information to satisfy the statutory requirements and the trial court did not abuse its discretion in overruling the motion for bill of particulars.

VI. Defendant also assigned as error the giving of instructions on first- and second-degree murder on the ground that the State failed to establish the required malice aforethought. The sufficiency of all the evidence will be discussed subsequently and this alleged error will be determined then.

VII. Defendant, a Negro, requested the trial court to instruct the jury: "It is the duty of the jury to consider the defendant's case as if she were a white woman, for the law is the same as to both white and colored women, there being no distinction in principles in respect to color."

As authority for the proposition that refusal to give such instruction is reversible error, she cites a number of Illinois cases so holding commencing with Campbell v. People, 16 Ill. 17, which was reaffirmed as recently as 1956 in People v. Galloway, 7 Ill.2d 527, 131 N.E.2d 474. No other jurisdictions are cited and we have found none which follows the Illinois cases. The State cites Timmons v. State, 143 Tex. Cr. App. 476, 159 S.W.2d 499, which holds to the contrary.

This requested instruction is a cautionary instruction in which the jury is advised as to its duties. Iowa follows the general rule expressed in 88 C. J. S., Trial, sections 297, 320, 320(b), pages 809, 846, 848; 53 Am. Jur. 603, Trial, section 822, which hold the giving of cautionary instructions rests largely in the discretion of the trial court. Clarke v. Hubbell, 249 Iowa 306, 315, 86 N.W.2d 905; Orwig v. Chicago, R. I. & P. Ry. Co., 217 Iowa 521, 250 N.W. 148, 90 A. L. R. 258; Kelly v. Chicago, R. I. & P. Ry. Co., 138 Iowa 273, 278, 114 N.W. 536, 128 Am. St. Rep. 195.

The trial court in addition to the stock instructions concerning testimony of defendant in her own behalf and the credibility of the witnesses gave this instruction:

"You should bear in mind in making up your verdict in this case that you will consider only such evidence as has been submitted to you upon the trial, and from this alone, independent of all other considerations, acting impartially, without bias, sympathy or prejudice in favor of or against either party, giving to the testimony of each witness such weight and credit as you believe it justly entitled to receive, and guided by the law as given you in these instructions bring in such a verdict as your best judgment will approve, and such as will be warranted and substantiated by the evidence."

These instructions adequately protected the rights of defendant. If we were to require a trial court to give requested instructions on all matters which might incite prejudice against a defendant in specific areas, the range would be unlimited. If one were entitled to such instruction as a matter of law because of race or color, one might also be entitled to such an instruction because of religion, foreign accent or an unpleasant physical appearance. The general instruction given by the trial court should be sufficient in almost all instances. Should something arise during the trial which might indicate a need for a specific instruction, the trial court could in his discretion determine the necessity for such instruction. We said in Kelly v. Chicago, R. I. & P. Ry. Co., supra, at page 277 of 138 Iowa:

"Nor can the court be expected to give express or special warning against every possible mistake or misapprehension into

which the jury may fall in the discharge of its functions. Something must be left to the intelligent apprehension and application by the jurors themselves of the general rules stated in the court's instructions. It may, and does occasionally, happen that some unfairness in argument of counsel or some other circumstance out of the ordinary arising in the course of the trial suggests to the court the propriety of guarding against prejudice therefrom to either party by an instruction covering the specific matter thus imported into the case. When and to what extent instruction of this nature shall be given rests very largely in the sound and impartial discretion of the court."

At the present time we are all conscious of the civil rights problem and it is repeatedly called to the attention of the public that citizens' rights are equal regardless of race, color or creed. There seems to be less need for such specific instruction now than at anytime in our history. When Campbell v. People was decided it might have been necessary to call this matter to the jury's attention. There is nothing in the record outside the fact that defendant was in fact colored, which points to a need for this specific reference. It was within the sound discretion of the district court to give or refuse the requested instruction and failure to give it is not reversible error.

 VIII. Defendant, while conceding the evidence is to be viewed in the light most favorable to the State, State v. Myers, 248 Iowa 44, 79 N.W.2d 382, contends there is no substantial evidence to support the instructions to the jury on murder or the jury verdict of second-degree murder.

The State's case supports these findings: Defendant became pregnant by a man named George while her husband, a serviceman, was overseas. She had not told him the truth about the date the baby was due. On the night of December 14, 1961, she began having labor pains and without awakening her husband, spent the last 45 minutes of her labor on the cold bathroom floor. Early in the morning of December 15, 1961, she gave birth to a normal full-term baby. It did not cry, but lived a few minutes. After the child was born, it lay on the cold floor until the placenta was also delivered. Defendant severed the umbilical cord with some scissors, wrapped the

baby and placed it in a suitcase which she closed and put under the baby crib where it was found. She lay down on a couch the rest of the night and did not tell her husband what had happened before he left for work. Because of continued bleeding she was taken to the hospital where she was questioned by officers of the law. The child died of anoxia or lack of oxygen. Defendant claims the baby did not cry or move and that it was dead when placed in the suitcase.

Defendant argues that anoxia may be caused by many things which would not be attributable to any of her acts. She refers to several physical conditions, all of which were eliminated as possible causes of death by the medical testimony for the State. Particular emphasis is placed upon the testimony of the pathologist which indicates anoxia could have been caused by shock resulting from the sudden change of temperature to which the newborn baby was exposed. Evidence of the medical examiner, while not definite, tends to eliminate shock as a cause. However, we need not decide whether the evidence eliminates shock as a cause of anoxia in this case, for such a finding would be of no avail to the defendant.

There are many cases based upon the failure of a mother to discharge her duties to a newborn child. Commonwealth v. Hall, 1948, 322 Mass. 523, 528, 78 N.E.2d 644, 647, quotes from the old English case of Regina v. Hughes, 7 Cox C. C. 301, 302, as follows:

" 'But it has never been doubted that if death is the direct consequence of the malicious omission of the performance of a duty (as of a mother to nourish her infant child) this is a case of murder. If the omission was not malicious and arose from negligence only, it is a case of manslaughter.' "

The same idea was expressed in Williams v. State, 88 Ga. App. 761, 77 S.E.2d 770, 771, in which the court said: "Where, on the trial of such indictment, the undisputed testimony is that, within two hours after its birth, an infant had been in some manner exposed to heat, from which it died about 40 hours later; and where the defendant admitted that she wished to conceal the child's birth from her family, and also stated

that she gave birth to it alone, and then left it near the heater for a short period of time, and, on returning, found it, as she supposed, dead, and attempted to conceal the body; and where the only medical witness testified that a newly born infant, being extremely vulnerable, might easily be unintentionally injured by being placed near a stove—no other facts appearing, the death must of necessity have been either (1) accident (2) murder, or (3) involuntary manslaughter in the commission of a lawful act without due caution or circumspection. If the child died without any fault or culpable neglect on the part of the mother, it was accident. If she placed it near a hot stove with the intention of killing it, the act was murder. If she left it near the stove without intending actual harm but in a careless and criminally negligent manner, the offense was involuntary manslaughter in the commission of a lawful act which probably might produce such a consequence."

The Alabama Court followed the same reasoning in Pallis v. State, 123 Ala. 12, 14, 26 So. 339, 82 Am. St. Rep. 106, 107, when they said:

"It seems to be well settled, that where a parent having charge of an infant of tender years, abandons and exposes it to the inclemency of the weather, such parent is guilty of an assault. If physical detriment ensue from such exposure, it is a battery on the child. [Citations]

" 'If the exposure or neglect of an infant or other dependent person, resulting in death, is an act of mere carelessness, wherein danger to life does not clearly appear, the homicide is only manslaughter; whereas, if the exposure or neglect is of a dangerous kind, it is murder. For example, if from an infant of tender years the person under obligation to provide for it willfully withholds needful food or any other needful thing, though not with the intent to kill, and by reason thereof the child dies, he commits murder.' " (Citations)

The only instruction on manslaughter given in the instant case was on voluntary manslaughter in the heat of passion without malice. An instruction on involuntary manslaughter or the doing of a lawful act in an unlawful manner, State v. Boston, 233 Iowa 1249, 11 N.W.2d 407; Williams v. State, 88

Ga. App. 761, 77 S.E.2d 770, would have been proper, but no request for such instruction was made either by the State or the defendant. The instruction given placed a greater burden on the State and probably accounts for the failure of defendant to request a different instruction. She was capably represented in both the trial and this appeal by able counsel.

There is a tendency for courts to apply the rule of reasonable doubt fairly strictly in these infanticide cases and many have been reversed on the grounds of insufficiency of the evidence. State v. Osmus, 73 Wyo. 183, 276 P.2d 469; Singleton v. State, 33 Ala. App. 536, 35 So.2d 375; Josef v. State, 34 Tex. Cr. 446, 30 S.W. 1067; Denham v. Commonwealth, 239 Ky. 771, 40 S.W.2d 384; State v. Johnson, 95 Utah 572, 83 P.2d 1010; Brown v. State, 95 Miss. 670, 49 So. 146; Taylor v. State, 108 Miss. 18, 66 So. 321; Fletcher v. State, Tex. Cr. App., 68 S.W. 173; State v. Voges, 197 Minn. 85, 266 N.W. 265; State v. Merrill, 72 W. Va. 500, 78 S.E. 699; Weaver v. State, 24 Ala. App. 208, 132 So. 706, but see: State v. Stringer, 357 Mo. 978, 211 S.W.2d 925. However, we feel the facts here would justify conviction of murder.

The jury could have found the death of the baby was brought about by deliberately allowing it to be born under these unnecessarily unfavorable circumstances. As a wife of a serviceman, excellent medical care was available without charge. She chose to have the baby unattended on a very cold bathroom floor, with a bed and help available. She allowed it to remain on the floor unattended for several minutes, making no effort to determine if it was alive or keep it alive. Such circumstances are sufficient to justify an inference of malice.

The California court in People v. Chavez, 77 Cal. App.2d 621, 628, 176 P.2d 92, 96, under similar facts, expresses our view of the matter:

"While the circumstances here are distressing, the evidence indicates a complete failure on the part of the appellant to use any of the care towards this infant which was necessary for its welfare and which was naturally required of her. While it is conceivable that in some such cases the mental and physical condition of a mother, at the time, might prevent her from

exercising that reasonable care which would ordinarily be required, and thus excuse her from blame for the consequences of her failure to act, no such situation here appears. The appellant's own testimony discloses not only that she had a full realization of the situation but that she was able to think clearly and act with definite ends in view. With plenty of assistance near at hand she intentionally chose not to call for any help. Although she knew that the baby had dropped into the toilet she made no effort to rescue it or care for it for some time. Knowing that the placenta should be removed she gave her first attention to that. Even after that was accomplished she got up, turned on the light and proceeded to care for herself. Only after this was done and some seven minutes after the baby was born did she pick up the infant and make any effort to observe its condition. Even then her actions were very perfunctory and she made no effort to do anything, or to call for aid, in order to take care of the baby and attempt to preserve its life. She then let it remain on the floor in a cold room for some fifteen minutes while she attended to other things, after which she put it in a newspaper and hid it under the tub. Even the appellant's own medical expert testified that a child born under these circumstances would die. The evidence is entirely sufficient to show that the death of this infant was caused by a criminal act."

Therefore, it makes no difference whether the baby was alive when placed in the suitcase or died from the conditions to which it was exposed, if the jury concluded the mother acted with malice aforethought.

We find no error and the case is affirmed.—Affirmed.

All Justices concur.