STATE OF WEST VIRGINIA

*v.*

LENNIS ANGEL

(No. 12866)

Submitted September 22, 1970.    Decided November 17, 1970.

*Samuel D. Lopinsky, Chester Lovett,* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *George E. Lantz,* Deputy Attorney General, *Willard A. Sullivan, Cheryl A. Wheeler,* Assistant Attorneys General, for defendant in error.

BERRY, JUDGE:

This is an appeal by the defendant, Lennis Angel, from a judgment of February 18, 1969, of the Circuit Court of Kanawha County, West Virginia, affirming a judgment of the Intermediate Court of Kanawha County entered July 24, 1968, on a jury verdict which had found the defendant guilty of murder in the first degree without recommendation for mercy.

The defendant was indicted at the January, 1967, term of the Intermediate Court of Kanawha County for the murder of Frances Voiles, a twelve-year-old girl who had been a baby-sitter for the two children of the defendant at his residence in the City of Nitro when last seen alive.

A writ of error was granted by this Court on September 15, 1969, and a motion by the defendant to file typewritten briefs was granted June 23, 1970. The case was submitted for decision on arguments and briefs of the parties at the September, 1970, Regular Term of this Court. The errors assigned by the defendant are numerous and relate to the objections that were made throughout the trial of this case which were continuously made and no doubt prolonged the trial and resulted in a lengthy record.

In order to understand the matters involved in this appeal it is necessary to review the evidence introduced during the trial, both on behalf of the state and of the defendant.

On November 19, 1966, around 4:30 a.m. some person reported to the Nitro City Police that a body was lying near the Nitro High School. After the report was received two Nitro City Policemen, Charles Sisk and Sergeant Johnson, went to the reported scene and found the dead body of a young girl lying doubled up with some of her clothes missing and the

rest disarranged. Her body bore numerous stab wounds. The testimony of a pathologist, Dr. Willis D. Garrard, who examined her body later that morning, showed that she had 46 stab wounds covering many areas of her body, and that the wounds were inflicted within a comparatively short time. He testified that her death was caused as the result of two or three deep stab wounds which penetrated the chest and back in the area of the heart and lungs.

Near the area where the body was found the officers also found a hunting knife and scabbard and the knife appeared to have blood on it. The identity of the girl was not established until almost noon on the day her body was found when her grandfather and other relatives identified the girl at the hospital where the pathologist was examining her. Although the victim was only twelve years of age, she was large for her age and the pathologist estimated her weight at about 135 pounds. Samples of the victim's blood and hair were given to the police by the pathologist.

After the body was found the police called Mayor W. W. Alexander of Nitro and Clarence A. Palmer, Captain of the Police of Nitro, who proceeded to the scene. Later the mayor called the county coroner and the state police. Two state troopers, John Rapp and F. L. Kyle, who were patrolling in that area, went to the funeral home to which the body had been taken before it was transported to the hospital for examination. Trooper R. L. Hurt was called into the case about 7:00 a.m. from his home.

Later in the morning the mayor received a telephone call from an unknown source to the effect that blood stains were visible on the sidewalk and around the front of the defendant's house. Mayor Alexander, together with two other men who happened to be in his office at the time, proceeded to the defendant's house and was met at the door by the defendant and his father who invited him into the house. The mayor observed what appeared to be blood stains outside the house, and after he entered the house found numerous similar stains on the walls, floor, window sills and some of the furnishings. The defendant's wife, mother and other persons were present

at that time. The evidence is uncontradicted that the defendant invited the mayor into his house.

The mayor talked with the defendant and his father and mentioned the identity of the dead girl, which the mayor at that time was aware of. The mayor testified that he did not at that time suspect the defendant and that he was merely investigating the matter because of the telephone call made to him in connection therewith, although he himself did not have police authority. The mayor discussed the situation with the defendant who told him that he had left the Angel home about 11:00 p.m. on the night before and that at that time there was a boy named Butch Reedy with the Voiles girl, that he felt the Reedy boy was the guilty party and wanted to help the police solve the matter as quickly as possible. The defendant's wife was not at home at the time and apparently did not come home until about 3 o'clock a.m. The two young children were at home with their father when their mother returned. While in the house the mayor observed that the floor had been recently cleaned. Another witness testified later in the trial that it was obvious some changes had been made in the house, because there were no rugs nor curtains present, and that he observed a greenish powder residue on the linoleum at some places similar to that left by Comet cleanser, a can of which was later found in the house.

The mayor told the defendant the police would want to examine the house, and the evidence introduced by the state is that the defendant readily agreed and either gave or had the key to the house given to the mayor for that purpose. The only conflict with regard to this matter contained in evidence offered by the state is to the effect that the defendant's father gave the key to the mayor without the express consent of the defendant. However, if it did so happen the defendant was present at the time this was done and made no objection.

The mayor, acting on the offer of cooperation by the defendant, suggested that the family might go to the father's home while the police were conducting their investigation to which suggestion the defendant agreed. The mayor also told the defendant he would have the police take him to the city hall

where he could make a statement if he so desired. The mayor called the police, and the defendant and his family went to the home of his parents. The mayor locked the door to the defendant's house and left with the key.

Soon thereafter two city police officers arrived at the home of the defendant's father and talked with the defendant who apparently took the officers to his home where he showed them blood stains in or around the house. On a later visit they observed the defendant's car which was parked nearby and noticed what appeared to be blood stains on the back seat. Officer Rumbaugh testified that he told the defendant he would like to examine his car including the interior of the trunk. The defendant gave them permission to look into the trunk and gave the police the keys. They found blood stains on the latch and interior, as well as some on a set of hubcaps which were on the floor of the trunk, and one observed that a portion of the floor mat was missing. They did not remove anything at that time. The police officers then asked the defendant if he would come to the Nitro police headquarters with them, but informed him that he did not have to go. The defendant said he wanted to go and the officers stated that at that time they advised him of his constitutional rights. A city councilman by the name of Dye was requested by the police to bring the defendant's car to the city hall, which he did. Dye had also looked into the trunk when the police officers opened it.

Upon arrival at the city hall the defendant was offered a room by the mayor for the use of the defendant and the investigating officers. He was introduced to Trooper Hurt, who advised the defendant of his rights and asked if he wanted the services of an attorney. The defendant first stated that he desired to have the services of Attorney Clarence Watts, but when the trooper started to dial the telephone the defendant stated that he did not need an attorney.

Trooper Hurt stated that at this time he did not consider the defendant as a suspect. However, Hurt discussed the case with the defendant who told him the same story that he had told the mayor but elaborated on it considerably. The knife

and scabbard had been brought to the city building and were shown to the defendant who stated they were his. Hurt also learned that the defendant's automobile had been brought to the city hall and when he looked at the car he noticed what appeared to be blood stains on the back of the front seat and around the gas tank area.

Hurt then checked the car registration with the Department of Motor Vehicles and called Captain Palmer at the office of the Justice of the Peace, Jack Kinder, and told him to obtain a search warrant for the car. Hurt later went to the office of the justice of the peace and obtained a warrant himself because of some delay in getting the warrant. About this same time a warrant was obtained for the defendant, although he was not arrested until after Hurt had inspected the defendant's car and found the blood stains in the front and in the trunk and on the loose hubcaps, and as the result had the car towed to the state police barracks for laboratory examination by technicians. After this was done Hurt returned to the city hall and advised the defendant that he was arrested, after which he took him over to the office of the justice of the peace where he was again advised of his constitutional rights by the justice of the peace and then taken to the Kanawha County jail.

There appears to be some confusion with regard to the investigation of the case because several officers were investigating it at the same time. Captain Palmer of the Nitro Police had looked at the house and the car and then proceeded to obtain a search warrant for both and a warrant for the defendant. At the same time personnel from the prosecuting attorney's office attempted to obtain search warrants which were apparently not signed until after the officers had searched the defendant's car, no doubt after certain articles had been removed from the car by the state police.

After Captain Palmer had obtained a search warrant for the defendant's house it was entered by the officers and items were obtained from the house that appeared to be connected with the crime. Curtains were later found on Strawberry Road near Coal River with what appeared to be blood stains on

them and the curtains fitted the door to the defendant's house. The police executed a list of items taken from the house and a copy of the list was left in the house. The original search warrant obtained for the house was lost but a copy was produced at the trial.

A lengthy pretrial hearing was held at which time the defendant attacked all of the matters pertaining to the warrants and statements by the defendant and moved to suppress all of the evidence in connection therewith. The defendant contended that the evidence does not show that the warrants were issued in accordance with the provisions of Code, 62-1A-2 and 3, as amended, which require certain facts to be contained in a complaint to show probable cause for obtaining a warrant and that the warrants obtained were not such as were permissible under the statute which contained three types of property that can be seized under a search warrant authorized by the statute such as stolen or other illegally obtained property, instrumentalities of the crime, and contraband property used in violation of the law.

The evidence regarding the information contained in the warrants and complaints is rather confusing and the record contains only certain statements with regard to them. The warrants were not contained in the record filed in this appeal. Although apparently the complaints and warrants stated that a murder had been committed and that evidence was in the car or house, some of the evidence consisted of hair, blood and clothing, and the warrants commanded the seizure of such items. It is the defendant's contention that the warrants were not sufficient to authorize the seizure of such items, mainly on the ground that the items mentioned in the complaint or warrant are not such as the statute permits to be searched for because such items fell in a classification of "mere evidence" and did not come under the three categories listed in the statute.

The trial court held that there was no unreasonable search and seizure in connection with the evidence used in the trial of this case and that the defendant's rights had been safeguarded.

The evidence introduced during the trial is perfectly clear as to the defendant's participation in the crime. It shows the following detailed actions on the night of the homicide: The defendant, upon quitting work at the Monsanto Plant at Nitro at 10:40 p.m. went to his home, found the baby-sitter there with his two children and his wife absent. He cleaned up and went out with another man and they visited various taverns where they drank beer and some stronger drinks and engaged in dancing at one tavern, but apparently the defendant was not highly intoxicated. He returned home about 2 o'clock a.m. at which time he laid out his hunting knife and gun preparing to go on a hunting trip; he then saw the baby-sitter slap his daughter who had tried to grab a magazine from the baby-sitter, which enraged him. Whereupon, he stabbed the baby-sitter 46 times in the space of a very few minutes. He then took the body to the high school in the trunk of his car and dumped it out. When he returned home he spent considerable time in cleaning the blood off the premises and household items. The materials he could not clean he took with him, along with his two children. He threw part of the items in the backwater near his house and other items in the Coal River Road area. He then tried to clean the car trunk and had to remove part of the floor mat from the trunk to get the bloody part out of it but failed to notice the hubcaps which had blood on them.

After that he went to the home of a friend by the name of Arnold Summers on Big Tyler Road, got him out of bed, appeared to be in a very agitated condition and told Summers a wild story about being in a fight and being chased by five men and stated that he might have killed one of the men and also might have cut a girl who was in the group. He asked Summers to help him clean himself and the car but Summers said he did not have any blood on him and that he would not help him clean the car but he allowed him to take a bath in his house. The defendant had changed his clothing before going to the Summers house because his discarded clothing was found by the police. Summers stated he told him he had put the stabbed man in his car trunk and dumped him in the woods. He wanted Summers' wife to keep the children while

he cleaned the car on Poca River but she refused to do so. He later returned home about the time his wife did which was about 3 o'clock a.m. and upon inquiry professed ignorance as to where the baby-sitter had gone although his wife found the baby-sitter's shoes and inquired why she had not taken them. Defendant at one time told Officer Hurt that when he returned home after work, he found a strange car and a blond boy with the baby-sitter, but upon returning after going to the taverns he found the front door open and the baby-sitter gone.

Early the next morning he appeared at the home of a relative and made plans for a hunting trip after which he went back home and by that time further questions had arisen about the baby-sitter which prompted the visit to his home by the mayor heretofore mentioned.

Many of the details with regard to the defendant's actions as related above were supplied by Gary Junior Boggs who was in the same cell with the defendant at the county jail and who testified that the defendant told him the story about what he had done. These details largely dovetail with the testimony of other persons who saw or talked with defendant in the few hours after the murder.

The defendant's attorneys used another jail inmate as a witness who stated that Boggs told him he fabricated the story. However, the story told by Boggs contains details that he could not have known other than having been told by the defendant, many of which were corroborated by other witnesses.

Numerous exhibits were introduced during the trial which appeared to have blood stains on them and were found either in the house or discarded elsewhere or in the car. Scientific evidence was introduced that several of the items introduced as exhibits were identified as human blood, the same type as that of Frances Voiles, the victim. Evidence was also introduced that hair found in the car was identical with that taken from the head of the victim by the pathologist.

The reason for the delay in the identification of the victim's body was because the girl's mother had thought she had spent the night at the defendant's home and was not disturbed about her absence.

Considerable evidence was introduced during the trial with regard to defendant's mental capacity as to whether he knew right from wrong. The defendant's attorneys refused to inform the court whether they intended to use the defense of insanity but in February, 1967, they requested that the court place the defendant in a sanitarium of their selection for mental examination which request was granted. He was there examined by a psychologist as well as a psychiatrist. The psychologist, D. P. Rogers, testified that he thought the defendant was insecure with sadistic tendencies which, if his masculinity was challenged, would result in homicidal actions toward women. The psychiatrist, Dr. Richard M. Kitching, spent eight hours at various times with the defendant and two additional hours with his parents. This doctor said the defendant whom he interviewed with and without sodium amatol was "pseudo-sociopathic paranoid schizophrenic", meaning that he had spells of instinctive actions without controls normal people have, that he thought people were plotting against him, and that he did not know right from wrong at the time of the crime. This doctor stated that the defendant could not remember killing the girl but just remembered becoming enraged and then finding himself with her stabbed body. This witness also testified from army records which the defendant submitted to him with regard to an instance where he attempted to tear up an army barracks over a trivial matter. Dr. Kitching also testified that the defendant attacked him when he tried to administer sodium amatol but later became docile.

After the examination requested by the defendant the court acting on its own motion and under the authority of Code, 62-3-9, as amended, had the defendant examined by Dr. Thomas Knapp and Dr. William Rossman. Dr. Knapp was unable to get anything out of the defendant because his lawyers had advised him not to talk with the doctor. In July, 1967, the defendant created a disturbance in the jail and cut himself severely at which time Dr. Knapp recommended to

the court that he be sent to Weston State Hospital which was done by the court. Dr. Knapp, in rebuttal to the testimony of Dr. Kitching, was asked a hypothetical question based on the evidence introduced during the trial and answered that the defendant knew the difference between right and wrong at the time of the crime, giving as his reason that defendant tried to conceal what he had done. Dr. Rossman was also used by the state on rebuttal. He had examined the defendant in April or May, 1967, in pursuance of an order of the court but the defendant refused to discuss the matter of the homicide with him. Also, he was asked a hypothetical question based on the evidence and stated that the defendant's activities after the homicide indicated a frenzy of guilt to cover up a wrong deed and that he would not have gone psychotic and then back to normal so suddenly.

The principal witness however in the rebuttal evidence offered by the state was a psychiatrist from Weston State Hospital, Dr. Manuel J. Aguiles, who testified from a report which was a composite of work done on the defendant by other staff members as well as a separate report made by him dealing with both the physical and mental nature of the defendant. He testified that the defendant admitted to him he did remember attacking the baby-sitter with a knife. He said the defendant admitted that he had a volatile temper and had done many antisocial acts with schizoid trends. The doctor thought the defendant was not a true psychotic or full schizophrenic and that the patient knew right from wrong at the time he examined him at the hospital. All of the efforts to examine the defendant other than the one request by the defendant were objected to by attorneys for the defendant and all of the evidence other than that by their own psychiatrist was objected to. It is the contention of the defendant that it violated his constitutional rights to be examined by anyone other than by his own psychiatrist.

Numerous assignments of error are made by the defendant in this appeal. However, upon close examination we find many of them without merit, such as the assignment of error that the defendant was not tried as required by the statute within three terms after the indictment was returned which was

apparently relied upon in the appeal but was not stressed during the argument of the case. It appears from the record because of continuances agreed to by the defendant that there was no merit whatsoever to this contention because the trial was clearly held within the limits prescribed by the statute.

The three main assignments of error relied on by the defendant which were stressed in the arguments and briefs are: (1) Illegal search warrants referred to above which were issued for the search of defendant's house and automobile, (2) improper testimony by psychiatrists who testified on behalf of the state, and (3) improper instructions given on behalf of the state and proper instructions offered and refused on behalf of the defendant.

We will discuss these assignments in order and take up the matter of the search warrants and a search of the defendant's house and automobile and the evidence used in connection therewith.

It appears to be the defendant's contention that none of the evidence obtained from the defendant's house and automobile can be used in the trial of this case because there was an unlawful and unreasonable search and seizure in each instance. It is the contention of the defendant that the search warrants did not comply with the provisions of the statute, Code, 62-1A-2, as amended, which only deals with illegally obtained property, instrumentalities of a crime and contraband, and that inasmuch as none of such property was involved in the search and seizure in the instant case, the warrants and searches were illegal. In other words, it is the contention of the defendant that a search warrant for "mere evidence" can not be issued and any evidence obtained by virtue of search warrants issued for "mere evidence" should be suppressed and not used in the trial of a criminal case. This argument is without merit because common sense would dictate that evidence of the commission of a crime obtained by virtue of a search and seizure warrant should certainly be used in the trial of a criminal case. It is true that considerable confusion has existed with regard to this matter in the past but apparently has been cleared up at the present time by

virtue of recent decided cases in the various states and the United States Supreme Court.

At common law there was no prohibition with regard to search and seizures other than that they be reasonable and it should be pointed out that the provisions of both the State and Federal Constitutions prohibit only unreasonable searches and seizures and there are still numerous situations in which a search and seizure warrant is not needed. 79 C.J.S., *Searches and Seizures*, Sections 8, 65 and 66; 16 M.J., *Searches and Seizures*, § 8; *McClannan v. Chaplain*, 136 Va. 1, 116 S.E. 495; *Morris v. Boles*, 386 F.2d 395; *Cert. denied*, 390 U.S. 1043, 88 S. Ct. 1640, 20 L. Ed. 2d 304. Some of the situations in which a search warrant is not needed are an automobile in motion, searches made in hot pursuit, searches around the area where an arrest is made, things that are obvious to the senses, and property that has been abandoned, as well as searches and seizures made that have been consented to. 79 C.J.S., *Searches and Seizures*, Sections 26, 62 and 66.

Much of the confusion has been caused by the case of *Gouled v. United States*, 255 U.S. 298, 41 S. Ct. 265, 65 L. Ed. 647, which was decided in 1921 and indicated that search warrants could not be obtained for mere evidence. However, this case has been overruled by the Supreme Court of the United States by the case of *Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642. A concise statement by former Chief Justice Traynor of the Supreme Court of California in the case of *People v. Thayer*, 47 Cal. Rptr. 780, 408 P.2d 108, *Cert. denied*, 384 U.S. 908, 38 S. Ct. 1342, 16 L. Ed. 2d 361, adequately answers this question in the following language: "The asserted rule that mere evidence cannot be seized under a warrant or otherwise is condemned as unsound by virtually all the modern writers. It is typically described as 'unfortunate' * * * and is a commonly-used example of a legal absurdity." Contrary to the contention of the defendant, the statute with regard to obtaining a search warrant for certain property, Code, 62-1A-2, as amended, merely authorizes search warrants for the three categories of property contained in the statute and does not prohibit or eliminate search warrants for other evidence of the commission of a crime or reasonable searches

without warrants for such evidence. 79 C.J.S., *Searches and Seizures*, § 6. However, in the case at bar the searches made of the defendant's house and automobile were clearly consented to, and therefore no search warrant was needed and no unreasonable search was made in connection with the evidence obtained and used in the trial of this case. 79 C.J.S., *Searches and Seizures*, § 62; *State v. Hall*, 164 Tenn. 548, 51 S.W.2d 851; *United States v. Bianco*, C.C.A. N.Y., 96 F.2d 97. The consent to search may be given by some person other than the accused in certain situations. *Tolbert v. State*, 224 Ga. 291, 161 S.E.2d 279, *Cert. den.*, 393 U.S. 1005, 89 S. Ct. 493, 21 L. Ed. 2d 463.

It is contended by the defendant that where there is a void search warrant consent to search cannot be given. The search warrants involved in the case at bar are not contained as exhibits in this record and therefore we are unable to carefully scrutinize the warrants. However, even if the warrants were void the searches and seizures were entirely proper and not unreasonable under the evidence in the instant case because they were clearly consented to and the mere fact that they may have been illegal or void search warrants is of no consequence in the case presented here and would not prohibit a search that is lawful if the warrants had never been issued. 79 C.J.S., *Searches and Seizures*, § 78; *United States v. Gearhart*, 326 F.2d 412; *United States v. White* (CCA4), 342 F.2d 379, *Cert. denied*, 382 U.S. 871, 86 S. Ct. 148, 15 L. Ed. 2d 109; *Morris v. Boles* (CCA4), 386 F.2d 395, *Cert. den.*, 390 U.S. 1043, 88 S. Ct. 1640, 20 L. Ed. 2d 304.

It was held in the case of *United States v. Horton*, 328 F.2d 132, that if officers are lawfully present and observe what is then and there immediately apparent, no search warrant is required in such instance, and the testimony by the officers with regard to the evidence which they observed is entirely proper. It was held in the case of *Chapman v. United States*, 346 F.2d 383, that it is actually not a search for officers to observe that which is clear and plainly in their vision if they are lawfully near or on and within any premises. It therefore clearly appears that the trial court properly admitted the evidence which was obtained from the defendant's house

and automobile and the motion to suppress such evidence which consumed much time and entailed considerable expense was unnecessary and properly overruled.

The next assignment of error deals with the testimony of psychiatrists who testified on behalf of the state.

It is the contention of the defendant that he is entitled to be examined by a psychiatrist but the state is not entitled to have such an examination made. If this were true it would completely tie the hands of the state in the prosecution of any case where a plea of insanity is involved and it would be helpless in such prosecution because this would allow the defendant to prove that he was insane but prohibit the state from introducing any evidence to the contrary.

In the first place there is specific statutory authority for such examination if the court is of the opinion that it is needed in the trial of the case where the defendant's insanity is involved, and it may be done on the court's own motion. Code, 62-3-9, as amended. About thirty states have such a statute similar to the statute in this state and such statutes have been held to be constitutional. *State v. Olson,* 143 N.W. 2d 69.

The defendant through his attorneys refused to advise the court during the preliminary stages of the trial whether or not they would rely on insanity as a defense. However, when a motion was made to have the defendant examined by a psychiatrist, as was done in this case, the state or judge can assume that a plea of insanity will be made and it is entirely proper for the court to order a similar examination and the defendant cannot raise any constitutional objection to such action. *State v. Myers,* 220 S.C. 309, 67 S.E.2d 506.

It should be pointed out that the evidence of the psychiatrist introduced by the state was used in rebuttal to contradict what the defendant had first placed into evidence in this case and it is proper to use such evidence in the trial of any case. Vol. 2, WARREN ON HOMICIDE, § 212, 41 C.J.S., *Homicide,* § 337. See *State v. Barker,* 128 W.Va. 744, 38 S.E.2d 346.

It should also be pointed out that the defendant was not compelled to talk with the psychiatrist. In fact he refused to talk with two doctors which the court had appointed before being sent to Weston State Hospital for examination. His communication with the doctor at Weston was purely voluntary and was not made to any officer in the investigation of the case and therefore does not come within the rule of the cases of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758. See *Commonwealth v. Byrd*, 421 Pa. 513, 219 A.2d 293, *Cert. denied*, 385 U.S. 886, 87 S. Ct. 181, 17 L. Ed. 2d 114, and *Commonwealth v. Musto*, 348 Pa. 300, 35 A.2d 307.

It was held in the case of *People v. Spencer*, 60 Cal. 2d 64, 31 Cal. Rptr. 782, 383 P.2d 134, *cert. denied*, 377 U.S. 1007, 84 S. Ct. 1924, 12 L. Ed. 2d 1055, that where the defendant pleaded insanity and was examined by a psychiatrist, even if he withdrew the plea of insanity it was proper to use the evidence of the psychiatrist in connection with the examination. In the instant case this rebuttal evidence by the psychiatrist introduced by the state was prompted by the testimony of the psychiatrist who testified on behalf of the defendant and the evidence with regard to the facts is practically the same in both instances although there is, of course, a difference in medical findings and conclusions. The psychiatrist who testified on behalf of the defendant stated that the defendant did not know right from wrong and the psychiatrist who testified for the state testified that he did know the difference between right and wrong. This was also true with regard to the testimony of the doctors who were asked hypothetical questions based on evidence introduced in the trial of the case wherein they stated the defendant knew the difference between right and wrong. Then, too, the evidence of all the physicians who testified on behalf of both the defendant and the state relative to the defendant's statements was almost identical to the testimony of the witness Boggs who testified on behalf of the state. The only difference was in one instance the witness stated that the defendant recalled that he saw the baby-sitter slap his child and then remembered

carrying her body out to his car, and the other witness said the defendant related that he saw the baby-sitter slap the child and he then stabbed or killed her, which practically amounts to the same thing in each instance. It is fundamental that any fact relating to the act of killing which tends to rebut the claim of the defendant is admissible in rebuttal evidence on the part of the prosecution. Vol. 2, WARREN ON HOMICIDE, § 212 at page 561. Therefore, the evidence of the physician offered by the state in rebuttal to evidence offered by the psychiatrist who testified on behalf of the defendant was properly admitted by the trial court in the trial of this case.

The assignments of error with regard to the instructions are general and attempt to cover all instructions both given by the state and offered by the defendant and refused by the court which are listed by numbers in the assignments of error with the additional statement "and any defense instructions refused by the court that might be omitted herein."

The record indicates that the defendant made only a general objection to the instructions both given and refused by the court, of which he complains on this appeal. It is necessary in order to have such matter considered on appeal for a party objecting to instructions given and refused by the trial court to state distinctly the matter to which he objects and the ground for his objection, none of which was done with regard to any instructions given or refused in the case presented here. Rule VI(c), Trial Court Rules for Trial Courts of Record, promulgated and adopted by the Supreme Court of Appeals July 22, 1960, and amended June 11, 1963, which is applicable to criminal trials in the State of West Virginia.

However, inasmuch as the defendant complains of several of the instructions in the brief submitted in this case and in the argument they will be discussed briefly.

The first instruction complained of is state's instruction number 4 which merely instructed the jury that a mortal wound given with a deadly weapon in the possession of the slayer without any, or upon very slight provocation, is prima facie, wilful, deliberate and premeditated killing and throws

upon the defendant the necessity of proving extenuating circumstances and unless he does or unless the circumstances appear from the case made by the state, he is guilty of murder in the first degree.

There was no error in the giving of this instruction and such instruction was approved in the case of *State v. McCauley*, 130 W.Va. 401, 43 S.E.2d 454.

The defendant objected to the refusal to give instruction 1C offered on his behalf which would have instructed the jury that even though the witness Boggs had been convicted of a felony and although that did not necessarily render him incompetent to testify it should consider the fact of his conviction in evidence as going to his credibility. This instruction was properly refused because it attempted to single out this witness' testimony in an undue attempt to discredit him. See *State v. Moubray*, 139 W.Va. 535, 81 S.E.2d 117. Then, too, a general instruction dealing with credibility of a witness, instruction number 17 offered by the defendant, was given by the court, which is a proper instruction for such matters.

It was not error for the court to refuse to give the defendant's instruction number 11 relating to reasonable doubt because the court gave instruction number 11A offered by the defendant which properly covered the same matter. The court committed no error in refusing to give instructions 20A, 20C, 21, 22 and 23 because they are either matters for the court and not for jury determination or did not comply with the legal requirements with regard to the rules of law in connection with the matters involved. See *State v. Cook*, 69 W.Va. 717, 72 S.E. 1025, in connection with defendant's instructions 21 and 22.

Although it was not necessary to take up the various instructions because the reasons and grounds for objections were not given as required by the rules, we nevertheless find no error in connection with any of the instructions either given or refused by the trial court to the jury at the trial of this case.

For the reasons stated herein, no prejudicial error was committed during the trial of this case and the judgment of the

Circuit Court of Kanawha County affirming the judgment of the Intermediate Court of Kanawha County is affirmed.

*Judgment affirmed.*