*PRELIMINARY PRINT*

VOLUME 604 U. S. PART 2

PAGES 423–457

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MARCH 21, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## DELLIGATTI *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 23–825.   Argued November 12, 2024—Decided March 21, 2025

Title 18 U. S. C. § 924(c) subjects a person who uses or carries a firearm during a "crime of violence" to a mandatory minimum sentence of five years.   §§ 924(c)(1)(A)(i) and (D)(ii).   Section 924(c)(3)(A) defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."   To determine whether an offense falls within § 924(c)(3)(A)'s "elements clause," the Court applies the categorical approach, asking whether the offense in question *always* involves the use, attempted use, or threatened use of force.   Here, Salvatore Delligatti was convicted of violating § 924(c) after he recruited gang members to kill a suspected police informant and gave them a loaded revolver to carry out the job.

Before trial, Delligatti moved to dismiss his § 924(c) charge on the ground that the charge lacked the required predicate crime of violence, but the District Court denied his motion.   Delligatti's indictment charged him with attempted murder under the violent-crimes-in-aid-of-racketeering (VICAR) statute, § 1959(a)(5), which required proof that Delligatti had attempted second-degree murder under New York law.   Delligatti argued that a VICAR offense predicated on New York second-degree murder is not a crime of violence under § 924(c)'s elements clause because homicide under New York law can be committed by omission, defined as the failure to perform a legal duty.   The Second Circuit affirmed the District Court's conclusion that New York attempted second-degree murder is a crime of violence for purposes of § 924(c)(3)(A).

*Held*: The knowing or intentional causation of injury or death, whether by act or omission, necessarily involves the "use" of "physical force" against another person within the meaning of § 924(c)(3)(A).   Pp. 429–439.

(a) It is impossible to deliberately cause physical harm without the use of physical force under § 924(c).   In *United States* v. *Castleman*, 572 U. S. 157, this Court held that under § 922(g)(9)—which prohibits anyone convicted of "a misdemeanor crime of domestic violence" from owning a firearm—"the knowing or intentional causation of bodily injury necessarily involves the use of physical force," *id.*, at 169.   The Court's reasoning proceeded in two steps.   First, the Court found it "impossible to cause bodily injury without applying [the] *force*" needed to commit

common-law battery. *Id.*, at 170 (emphasis added). Second, the Court held that "the knowing or intentional application of force is a '*use*' of force" in that sense. *Ibid.* (emphasis added).

The logic of *Castleman* extends to § 924(c). Although the parties stipulate that § 922(g)(9) and § 924(c) require different levels of force— battery-level force versus violent force—that difference is immaterial here. As the Court held in *Stokeling* v. *United States*, 586 U. S. 73, 80, violent force encompasses "the 'force' required for common-law robbery." Although a mere touch is not sufficient force for common-law robbery, any force that actually causes injury or death is. *Id.*, at 83. Further, common-law robbery, like battery, can be committed through the indirect use of force. Thus, the "knowing or intentional causation of bodily injury necessarily involves the use of physical force" under § 924(c) just as it does under § 922(g)(9). *Castleman*, 572 U. S., at 169. Pp. 429–433.

(b) *Castleman*'s logic forecloses Delligatti's challenge. Because New York second-degree murder requires proof that the defendant intentionally caused the death of another person, it necessarily involves the use of physical force under § 924(c).

Delligatti contends that an offender can commit New York second-degree murder without being the *actual* cause of the victim's death because the offender can do so through omission of a legal duty. But the test for "actual causality" is whether the victim's death "would not have occurred in the absence of—that is, but for—the defendant's conduct." *Burrage* v. *United States*, 571 U. S. 204, 211 (internal quotation marks omitted). When a child starves to death after the parents refuse to provide food, the parents' conduct is no less a cause of death than if the parents had poisoned the child.

Delligatti also argues that an offender who causes harm by omission does not make "use" of physical force "against the person . . . of another." § 924(c)(3)(A). But it is natural to say that a person makes "use" of something by deliberate inaction. A mother who purposely kills her child by declining to intervene when the child drinks bleach makes "use" of the bleach's poisonous properties.

Similarly, the phrase "against the person or property of another" in § 924(c)(3)(A) does not exclude crimes of omission. That phrase at most requires that another person be "the conscious object" of the force. *Borden* v. *United States*, 593 U. S. 420, 430 (plurality opinion). Whenever an offender deliberately causes bodily harm by omission, another person is necessarily the conscious object of physical force.

The ordinary meaning of the term "crime of violence" confirms that Congress meant for the elements clause to cover crimes of omission. Intentional murder is *the* prototypical "crime of violence," and it has

long been understood to incorporate liability for both act and omission. In 1986, when the elements clause was enacted, at least 33 States generally defined criminally culpable acts to include omission of a legal duty, and leading criminal-law treatises equated act and omission. If the elements clause is to have a reasonable relationship to the term it defines, it must encompass cases where the offender makes use of physical force by deliberate inaction. Pp. 433–438.

83 F. 4th 113, affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, SOTOMAYOR, KAGAN, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which JACKSON, J., joined, *post*, p. 439.

*Allon Kedem* argued the cause for petitioner. With him on the briefs were *Matthew L. Farley, Dana Or, Dana Kagan McGinley, Charles Birkel, Lucas Anderson*, and *Nicole L. Masiello.*

*Deputy Solicitor General Feigin* argued the cause for the United States. With him on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Argentieri, Aimee W. Brown*, and *Sonja M. Ralston.*[*]

JUSTICE THOMAS delivered the opinion of the Court.

Title 18 U. S. C. § 924(c)(3)(A) defines a "crime of violence" to include a felony that involves the "use of physical force" against another person. In the context of a closely related statute, we have held that "the knowing or intentional causation of bodily injury necessarily involves the use of physical force." *United States* v. *Castleman*, 572 U. S. 157, 169 (2014). This case asks whether that principle extends to § 924(c)(3)(A) and, if so, whether the principle holds in cases

---

[*]Briefs of *amici curiae* urging reversal were filed for the Federal Public Defender Offices in the Second Circuit by *Matthew B. Larsen* and *Ginger D. Anders*; for the National Association of Criminal Defense Lawyers et al. by *Alan Schoenfeld, Joshua L. Dratel*, and *Mary Price*; and for the National Association for Public Defense by *Daniel Woofter* and *Emily Hughes.*

where an offender causes bodily injury by omission rather than action. We answer both questions in the affirmative.

## I

## A

Section 924(c) subjects any person who uses or carries a firearm during or in relation to a "crime of violence" to a mandatory minimum sentence of five years, to be served consecutively with any other term of imprisonment. §§ 924(c)(1)(A)(i) and (D)(ii). By the terms of the statute, a federal felony qualifies as a predicate crime of violence if it falls within either of two provisions. Under the first provision, known as the elements clause, an offense qualifies if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3)(A). Under the second provision, known as the residual clause, an offense qualifies if it, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." § 924(c)(3)(B). In *United States* v. *Davis*, 588 U. S. 445 (2019), this Court held that the residual clause is unconstitutionally vague. *Id.*, at 470.

This Court applies a "categorical approach" to determine whether an offense falls within the elements clause. *United States* v. *Taylor*, 596 U. S. 845, 850 (2022). Under that approach, we do not examine the defendant's actual conduct. Instead, we ask whether the offense in question "always" involves the use, attempted use, or threatened use of force. *Ibid.* If the offense can be committed without the use, attempted use, or threatened use of force, it is not a crime of violence under the elements clause.

## B

Salvatore Delligatti is an associate of the Genovese crime family, one of the New York Mafia's so-called Five Families. In 2014, a local gas station owner hired Delligatti to kill Jo-

seph Bonelli, a "neighborhood bully" and suspected police informant. *United States* v. *Pastore*, 83 F. 4th 113, 117 (CA2 2023). Delligatti recruited several members of a street gang to carry out the job and provided them with a car and a loaded revolver. The gang members drove to Bonelli's house while he was out, intending to shoot him when he returned. They abandoned this plan, however, after seeing too many potential witnesses. At Delligatti's urging, the gang members returned the following day to try again. But, by this time, the police had discovered the plot and arrested the gang members on their way to carry out the hit.

The Government charged Delligatti with several offenses, including one count of using or carrying a firearm during or in relation to a "crime of violence" under § 924(c). The indictment charged as a predicate crime of violence attempted murder under the violent-crimes-in-aid-of-racketeering (VICAR) statute, 18 U. S. C. § 1959(a)(5). VICAR attempted murder requires proof that the defendant committed an underlying state or federal offense that constitutes attempted "murder." *Ibid.* The Government alleged that Delligatti met this requirement by attempting second-degree murder under New York law. A person commits second-degree murder when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N. Y. Penal Law Ann. § 125.25(1) (West 2009).

Before trial, Delligatti moved to dismiss his § 924(c) charge on the ground that the Government had not alleged a valid predicate crime of violence. The District Court denied the motion, holding that there "can be no serious argument" that VICAR attempted murder is not a crime of violence. App. to Pet. for Cert. 40a–41a. A jury convicted Delligatti on all counts, and the District Court sentenced him to 25 years' imprisonment.

On appeal to the U. S. Court of Appeals for the Second Circuit, Delligatti argued that a VICAR offense predicated on New York second-degree murder falls outside § 924(c)'s

elements clause.    Homicide under New York law can be committed by act *or* omission, with the latter defined as a failure to perform a legally imposed duty.    N. Y. Penal Law Ann. §§ 15.00(3), 15.10 (West 2009); *People* v. *Steinberg*, 79 N. Y. 2d 673, 680, 595 N. E. 2d 845, 847 (1992).    Thus, for example, a parent who intentionally causes his child's death by withholding food or medical care commits second-degree murder under New York law.    See *People* v. *Best*, 202 App. Div. 2d 1015, 1015–1016, 609 N. Y. S. 2d 478, 479 (1994).    Delligatti argued that omission-based crimes like these do not involve the "use of force."

While Delligatti's appeal was pending, the Second Circuit rejected his position in a different case.    Relying on our decision in *Castleman*, it held that the " 'knowing or intentional causation of bodily injury *necessarily* involves the use of physical force,' " even when the defendant causes harm "by omission."    *United States* v. *Scott*, 990 F. 3d 94, 111, 114 (2021) (en banc) (quoting 572 U. S., at 169, and adding emphasis).    Applying *Scott*, the Second Circuit held in Delligatti's case that New York attempted second-degree murder—and, by extension, a VICAR offense predicated on it—is a crime of violence because it necessarily involves at least the attempted use of force.    83 F. 4th, at 121–122.[1]

We granted certiorari to decide whether an individual who knowingly or intentionally causes bodily injury or death by failing to take action uses physical force within the meaning of the elements clause.    602 U. S. 1013 (2024).[2]

---

[1] The Second Circuit assumed that the status of Delligatti's VICAR offense turns on whether the underlying state offense is a crime of violence. 83 F. 4th, at 119–120.    However, at least one Court of Appeals has held that a VICAR offense can be a crime of violence even if its underlying predicate offense is not.    *United States* v. *Thomas*, 87 F. 4th 267, 274–275 (CA4 2023).    We express no view on that issue.

[2] Before this Court, Delligatti does not dispute the Second Circuit's holding that New York attempted second-degree murder is a crime of violence if the completed offense is a crime of violence.    See Pet. for Cert. 28.    We decide this case on that assumption.

## II

The Second Circuit correctly held that causing bodily harm by omission requires the use of force. As in *Castleman*, the "use" of "physical force" in § 924(c) encompasses the knowing or intentional causation of bodily injury. There is no exception to this principle when an offender causes bodily injury by omission rather than affirmative act. Delligatti's § 924(c) challenge therefore fails.

### A

*Castleman* establishes that under statutes like the one at issue here it is impossible to deliberately cause physical harm without the use of physical force. Although *Castleman* addressed a different statute, we conclude that its holding extends to § 924(c).

#### 1

Section 922(g)(9), the statute at issue in *Castleman*, prohibits anyone convicted of "a misdemeanor crime of domestic violence" from owning a firearm. As under § 924(c)'s elements clause, an offense qualifies under this provision if, along with other criteria, it "has, as an element, the use . . . of physical force." § 921(a)(33)(A). The question presented in *Castleman* was whether an offense for "'intentionally or knowingly caus[ing] bodily injury'" met that description. 572 U. S., at 161. The District Court had held that it was possible to commit the offense without the use of force, because the offense encompassed deceiving someone "'into drinking a poisoned beverage.'" *Id.*, at 170. We disagreed. Our reasoning proceeded in two steps.

First, we found it "impossible to cause bodily injury without applying *force*" in the sense relevant here. *Ibid.* (emphasis added). Section 922(g)(9), we held, encompasses the kind and "degree of force that supports a common-law battery conviction." *Id.*, at 168. That "concept of 'force'" includes causing bodily harm indirectly, such as "'by administering a poison or by infecting with a disease, or even by

resort to some intangible substance,' such as a laser beam." *Id.*, at 170 (quoting 2 W. LaFave, Substantive Criminal Law § 16.2(b) (2d ed. 2003)).

Second, we held that "the knowing or intentional application of force is a *'use'* of force" under the provision in question. 572 U. S., at 170 (emphasis added). A person uses force in that sense when he makes force his "instrument," whether directly or indirectly. *Id.*, at 170–171 (internal quotation marks omitted). So, for example, when a person "sprinkles poison in a victim's drink," he uses force by "employing poison knowingly as a device to cause physical harm," even though "the act of sprinkling" does not itself involve force. *Id.*, at 171 (alteration and internal quotation marks omitted). Thus, whenever someone knowingly causes physical harm, he uses force within the meaning of § 922(g)(9).

2

The logic of *Castleman* extends to § 924(c). Both § 922(g)(9) and § 924(c) cover offenses involving the "use" of "physical force." To be sure, these two provisions arguably use the term "physical force" to require different levels of force—battery-level force for § 922(g)(9) and violent force for § 924(c).[3] But, because both battery-level force and violent force may be applied indirectly, that difference is immaterial here.

In *Castleman*, Justice Scalia wrote an opinion concurring in the judgment observing that deliberately causing injury necessarily involves the use of both battery-level and violent force. The *Castleman* majority held that because of § 922(g)(9)'s particular focus on *misdemeanor* crimes of *do-*

---

[3] We have never addressed the meaning of "physical force" in § 924(c)'s elements clause. The parties, however, agree that the term refers to "*violent* force" as defined by *Johnson* v. *United States*, 559 U. S. 133, 140 (2010), rather than the battery-level force at issue in *Castleman*. See Brief for Petitioner 19; Brief for United States 10. We assume without deciding that interpretation.

*mestic* violence, the phrase "use of physical force" in that statute requires only battery-level force, which can be satisfied by "'even the slightest offensive touching.'" *Id.*, at 160–168. The majority thereby distinguished *Johnson* v. *United States*, 559 U. S. 133 (2010), where this Court had held that the same phrase in the elements clause of the Armed Career Criminal Act (ACCA) required a higher showing of "*violent* force—that is, the force capable of causing physical pain or injury to another person." *Id.*, at 140; see 18 U. S. C. § 924(e)(2)(B)(i). Justice Scalia disagreed, concluding that § 922(g)(9) requires violent force. *Castleman*, 572 U. S., at 175 (opinion concurring in part and concurring in judgment). But, he made clear that this point of disagreement did not affect the outcome of that case. He explained that intentionally or knowingly causing bodily injury "categorically involves the use of 'force capable of causing physical pain or injury to another person.'" *Ibid.* (quoting *Johnson*, 559 U. S., at 140). And, "for the reasons given by the Court," that is so even when the defendant "cause[s] bodily injury through deceit or other nonviolent means." 572 U. S., at 175, n. 1 (opinion of Scalia, J.).[4]

Justice Scalia's view of violent force eventually garnered a majority. In *Stokeling* v. *United States*, 586 U. S. 73 (2019), we held that violent force encompasses "the 'force' required for common-law robbery," which is "the quintessential ACCA-predicate crime." *Id.*, at 80. Common-law robbery requires only the force needed to overcome the victim's

---

[4] In the course of explaining why he thought that § 922(g)(9) required the use of *violent* force, Justice Scalia objected to the majority's reliance on advocacy groups that broadly defined "domestic violence" to include, among other things, acts that "humiliate," "isolate," "frighten," or "blame" someone, and acts "*of omission.*" *Castleman*, 572 U. S., at 181 (internal quotation marks omitted; emphasis added). In this context, the phrase "acts of omission" plainly is not limited to *causing injury or death* by deliberate inaction. Justice Scalia's rejection of that definition thus sheds no light on the question presented in this case. Contra, *post*, at 449–450 (GORSUCH, J., dissenting).

slightest physical resistance, even if it results in "minimal pain or injury." *Id.*, at 78, 83–84. Thus, although "'the merest touching'" is not violent force, any force that actually causes injury or death is. *Id.*, at 83 (quoting *Johnson*, 559 U. S., at 139). We therefore concluded in *Stokeling* that Justice Scalia's "understanding of 'physical force'" in *Castleman* was "consistent with our holding." 586 U. S., at 85.

By pegging "physical force" to robbery, *Stokeling* makes clear that even the indirect causation of bodily harm requires the use of violent force. This principle was well established when Congress enacted § 924(c)'s elements clause in 1986. 100 Stat. 456–457. As one contemporaneous treatise put it, "[j]ust as battery may be committed by the administration of poison, so the force used to obtain property from a person against his will may be applied internally." R. Perkins & R. Boyce, Criminal Law 348 (3d ed. 1982) (footnote deleted); see also *People* v. *Dreas*, 153 Cal. App. 3d 623, 627–629, 200 Cal. Rptr. 586, 589 (1984); *Carroll* v. *State*, 440 So. 2d 343, 344–345 (Ala. Crim. App. 1983); *People* v. *Berryman*, 43 Mich. App. 366, 367–368, 204 N. W. 2d 238, 239 (1972); *State* v. *Skillings*, 98 N. H. 203, 207, 97 A. 2d 202, 205 (1953); *State* v. *Snyder*, 41 Nev. 453, 456–459, 172 P. 364, 364–365 (1918); 2 W. LaFave & A. Scott, Substantive Criminal Law § 8.11(d)(1), p. 447 (1986) (LaFave & Scott); 4 C. Torcia, Wharton's Criminal Law § 479, p. 67 (14th ed. 1981) (Wharton).

Delligatti resists extending *Castleman*'s logic to § 924(c). He argues there cannot be an "automatic connection" between injury and the *violent* force § 924(c) requires because even a small degree of force might injure an "eggshell" victim. Brief for Petitioner 37–38. But, as we held in *Stokeling*, the minimal force needed to overcome the resistance of "a feeble or weak-willed victim" still qualifies as sufficiently "violent" to fall within the statute's ambit. 586 U. S., at 83. Delligatti also concedes that it is possible to use violent force "indirectly," Brief for Petitioner 7, as when a person tricks another into eating food that has aged to the point of becom-

ing toxic, Tr. of Oral Arg. 17. Thus, the "knowing or intentional causation of bodily injury necessarily involves the use of physical force" under §924(c) just as it does under §922(g)(9). *Castleman*, 572 U. S., at 169.

B

*Castleman*'s logic forecloses Delligatti's challenge. Deliberately causing injury necessarily involves the use of force in the sense relevant here. Under New York law, second-degree murder requires proof that the defendant intentionally "cause[d] the death of another person." N. Y. Penal Law Ann. §125.25(1). And, it should go without saying, intentionally causing death counts as deliberately causing injury. Thus, second-degree murder in New York—and, by extension, Delligatti's VICAR offense premised on it—is a crime of violence under §924(c)'s elements clause.

Delligatti disagrees. He insists that New York second-degree murder falls outside *Castleman*'s rule because a person can commit the offense through omission of a legal duty. *Steinberg*, 79 N. Y. 2d, at 680, 595 N. E. 2d, at 847; *supra*, at 428. In such cases, Delligatti contends, the law may *deem* the offender the cause of the victim's death through "legal fiction," but that fiction is not enough to make the person the "actual cause." Reply Brief 7. That is incorrect. We have explained that the test for "actual causality" is whether the victim's death "would not have occurred in the absence of— that is, but for—the defendant's conduct." *Burrage* v. *United States*, 571 U. S. 204, 211 (2014) (internal quotation marks omitted). When a young child starves to death after his parents refuse to give him food, that harm would not have occurred but for the parents' choice. Both in the eyes of the law and as a practical matter, the parents' conduct is no less a cause of the child's death than if the parents had poisoned him.

Unable to escape *Castleman*'s reach, Delligatti argues in the alternative that its rule is unsound as applied to omis-

sions. An offender who causes harm by omission, the theory goes, does not make "use" of physical force "against the person . . . of another." § 924(c)(3)(A). Again, we disagree.

It is perfectly natural to say that a person makes "use" of something by deliberate inaction. A car owner, for example, can "use" the rain to wash his vehicle simply by leaving it parked on the street. And, a fugitive can "use" the cover of darkness to hide by lying still at night. In the same way, a mother who purposely kills her child by declining to intervene when the child finds bleach and starts drinking it makes "use" of the bleach's poisonous properties to accomplish her unlawful end. And, a husband who deliberately abandons his wife to die in the cold "use[s] th[e] forces" of "the elements" to cause her death. *Territory* v. *Manton*, 7 Mont. 162, 168, 14 P. 637, 638–639 (1887). Delligatti's proposed action-inaction distinction has no basis in ordinary meaning.

Similarly, we reject the argument that the phrase "against another" excludes crimes of omission. At most, that phrase requires that another person be "the conscious object" of the force the offender uses. *Borden* v. *United States*, 593 U. S. 420, 430 (2021) (plurality opinion). Put differently, the language "against another" specifies the required object of the force (another person, rather than, say, an animal), and possibly also the *mens rea* with which the object must be targeted (knowingly or intentionally, rather than negligently or recklessly). *Id.*, at 430–434.[5] Whenever an offender deliber-

---

[5] In *Borden*, this Court split evenly on the meaning of "against another" in ACCA's elements clause. The four-Justice plurality held that the phrase identifies the object of the force *and* limits the elements clause to knowing or intentional wrongdoing. 593 U. S., at 430–434. The four-Justice dissent held that the phrase only identifies the object. *Id.*, at 454–461 (opinion of KAVANAUGH, J.). The author of this opinion supplied the fifth vote for the holding that the elements clause requires at least knowing conduct, but did so for reasons unrelated to the meaning of "against another." *Id.*, at 446 (THOMAS, J., concurring in judgment). We express no view on whether the phrase "against another" imports a *mens rea* requirement, which is not necessary to resolve this case.

ately causes bodily harm by omission, he necessarily makes another person the conscious object of physical force. In the bleach example, the mother's refusal to take away the bleach is not an accident, but rather a deliberate effort to make the child suffer the bleach's poisonous effects. The mother thus uses force *against her child*. It would be passing strange to say the mother used force to cause the child's death, but did not use force *against* anyone.

Context also confirms that crimes of omission fall within the elements clause. The elements clause is a definition of the term "crime of violence." § 924(c)(3). When choosing among interpretations of a statutory definition, the "ordinary meaning" of the "defined term" is an important contextual clue. *Bond* v. *United States*, 572 U. S. 844, 861 (2014). Thus, we prefer interpretations of the elements clause that encompass prototypical "crimes of violence" over those that do not. See *Stokeling*, 586 U. S., at 81–82; *Voisine* v. *United States*, 579 U. S. 686, 696 (2016); *Castleman*, 572 U. S., at 167.

Intentional murder is *the* prototypical "crime of violence," and it has long been understood to incorporate liability for both act and omission. At the time of the elements clause's enactment, it was widely accepted that one could commit murder by refusing to perform a legal duty, like feeding one's child. See, *e. g.*, *Lackey* v. *State*, 246 Ga. 331, 331–332, 336, 271 S. E. 2d 478, 480–481, 483 (1980); *State* v. *Nicholson*, 585 P. 2d 60, 61–63 (Utah 1978) (*per curiam*); *People* v. *Burden*, 72 Cal. App. 3d 603, 616–619, 140 Cal. Rptr. 282, 289–291 (1977); *Biddle* v. *Commonwealth*, 206 Va. 14, 20–21, 141 S. E. 2d 710, 714–715 (1965); *State* v. *Shephard*, 255 Iowa 1218, 1232–1235, 124 N. W. 2d 712, 720–722 (1963); 1 LaFave & Scott § 3.3, at 282–283. As the Government notes, this view had deep roots in the common law. See *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 297 (1990) (Scalia, J., concurring) (collecting authorities); *Commonwealth* v. *Hall*, 322 Mass. 523, 527–528, 78 N. E. 2d 644, 647 (1948) (same); 1 W.

Hawkins, Pleas of the Crown § 8, p. 79 (1716); Brief for United States 23–26.

Moreover, murder was not the only violent crime that States recognized could arise from omission. Knowingly causing nonlethal injury to one's child by neglect, for example, could amount to common-law battery. See, *e. g.*, *People* v. *Bernard*, 149 Ill. App. 3d 684, 693–695, 500 N. E. 2d 1074, 1079–1080 (1986); *State* v. *Walden*, 306 N. C. 466, 476, 293 S. E. 2d 780, 786–787 (1982); 1 LaFave & Scott § 3.3(e), at 294. In 1986, at least 33 States had statutes generally defining criminally culpable acts to include omission of a legal duty. See Brief for United States 27–28, n. 3. Leading criminal-law treatises similarly equated act and omission. 1 La-Fave & Scott § 3.3, at 282–283; 1 Wharton § 25, at 116–120 (1978); see also ALI, Model Penal Code § 1.13(7), p. 209 (1985) ("acted" "includes, where relevant, 'omitted to act'").

Thus, we cannot adopt Delligatti's interpretation without excluding traditional and widely accepted definitions of murder and other prototypical violent crimes from the elements clause's reach. If the elements clause is to have a reasonable relationship to the term it defines, it must encompass cases where the offender makes use of physical force by deliberate inaction. To the extent any doubt remains that Congress meant for the elements clause to cover crimes of omission, the ordinary meaning of "crime of violence" resolves it.

Delligatti insists that his position—that murder is not a crime of violence—is not as outlandish as it sounds. Congress, he tells us, expected crimes like his to fall within the now-defunct residual clause. See § 924(c)(3)(B) (covering offenses that involve "a substantial risk that physical force . . . may be used"). But, to say that killing someone involves a "risk" of force is a gross understatement in ordinary speech, rendering the residual clause at best an awkward fit. The elements clause is thus the natural home for murder and other prototypical violent crimes, and the unreasonableness of excluding such crimes from the elements clause is an "ad-

ditional reason to read the statute as we do." *Castleman*, 572 U. S., at 167.

## C

The dissent's arguments fare no better than Delligatti's. The dissent asserts that the use of physical force requires "a violent or extreme physical act" rather than "mere touching or pre-existing natural forces." *Post*, at 442 (opinion of GORSUCH, J.). In other words, disagreeing with Justice Scalia, the dissent maintains that many ways of causing bodily harm indirectly, such as deceiving the victim or slipping poison into his drink, do not involve the use of violent force. *Ibid.*, n. 1; see *Castleman*, 572 U. S., at 175, n. 1 (opinion of Scalia, J.). This view runs headlong into *Stokeling*'s holding that violent force encompasses "the 'force' required for common-law robbery." 586 U. S., at 80. Common-law robbery is a crime that may be committed indirectly, *supra*, at 432, such as by slipping a sedative into the victim's coffee, *Dreas*, 153 Cal. App. 3d, at 627, 200 Cal. Rptr., at 589. Thus, no violent or extreme physical act is needed to use force within the meaning of the elements clause. Not even Delligatti disagrees with that basic proposition. See *supra*, at 432–433.

The dissent suggests that, in any event, criminal statutes do not cover omissions absent express language to that effect. *Post*, at 444–445. No such clear-statement rule exists. Many crimes "may be committed either by affirmative action or by failure to act" even though they are not "specifically so defined." 1 LaFave & Scott § 3.3, at 282; see *supra*, at 435–436. New York's second-degree murder statute is a prime example. It prohibits intentionally "caus[ing] the death of another person" without explicitly mentioning omissions. N. Y. Penal Law Ann. § 125.25(1). But, because one can cause death by omission, the statute covers omissions. *Supra*, at 428. So too here, because one can make "use of physical force" against another by omission, § 924(c)(3)(A), the elements clause covers omissions.

Nor do any of our precedents establish that, in the context of the elements clause, it is impossible to "use" force by omission. Contra, *post*, at 447. In *Bailey* v. *United States*, 516 U. S. 137 (1995), this Court explained that the word "use" means " '[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.' " *Id.*, at 145. Thus, the "mere possession of a firearm" during a crime does not amount to a "use" of the firearm under § 924(c) if the wrongdoer does not employ the firearm to accomplish his criminal end. *Id.*, at 143; see also *Voisine*, 579 U. S., at 692–693, and n. 3 (reiterating *Bailey*'s interpretation of "use"); *Leocal* v. *Ashcroft*, 543 U. S. 1, 9 (2004) (same). In contrast, a mother who lets her child drink bleach because she wants him to die *uses* the force of the bleach within the meaning of the elements clause because she accomplishes her purpose by means of the bleach's harmful effects. And, by targeting a particular individual, the mother has taken a "specific actio[n] against [a] specific perso[n]," not merely "pose[d] an abstract risk to community peace and order." *Taylor*, 596 U. S., at 856. As a matter of both text and precedent, deliberately causing injury or death by omission is a *use* of physical force.

Finally, the dissent takes issue with our reliance on the ordinary meaning of "crime of violence," branding it an impermissible "resort to unexpressed legislative intentions." *Post*, at 452. To the contrary, we engage in the standard task of reading a statutory definition in light of the conventional meaning of the term it defines. "Since on this side of the looking-glass an entirely artificial definition is rare, the meaning of the definition is almost always closely related to the ordinary meaning of the word being defined." A. Scalia & B. Garner, Reading Law 228 (2012). Thus, when the meaning of the elements clause "is not clear," the ordinary meaning of the term "crime of violence" is one of "the most important" factors we can consider. *Ibid.*

\*          \*          \*

The knowing or intentional causation of injury or death, whether by act or omission, necessarily involves the use of physical force against another person. The judgment of the Court of Appeals for the Second Circuit is affirmed.

*It is so ordered.*

JUSTICE GORSUCH, with whom JUSTICE JACKSON joins, dissenting.

Imagine a lifeguard perched on his chair at the beach who spots a swimmer struggling against the waves. Instead of leaping into action, the lifeguard chooses to settle back in his chair, twirl his whistle, and watch the swimmer slip away. The lifeguard may know that his inaction will cause death. Perhaps the swimmer is the lifeguard's enemy and the life-guard even wishes to see him die. Either way, the lifeguard is a bad man. In many States, he may be guilty of a serious crime for failing to fulfill his legal duty to help the swimmer. But does the lifeguard's offense also qualify under 18 U. S. C. §924(c)(3)(A) as a "crime of violence" involving the "use . . . of physical force against the person . . . of another"? The Court thinks so. I do not. Section 924(c)(3)(A) may reach many crimes, but it does not reach crimes of omission.

I

A

As I see it, the Court reaches the wrong destination be-cause it takes a wrong turn at the start. Our cases are re-plete with reminders that, when faced with a question of statutory interpretation, the text is where we must begin (and often end). Today, however, the Court whistles past the terms Congress gave us in §924(c)(3)(A). Instead, it chooses to begin (and largely end) its analysis of this case with an examination of precedent and assumptions about

congressional purposes. *Ante*, at 429–437. I will get to those matters later. But first, let's do what the Court does not and look to the text.

Section 924(c)(1) imposes a sentencing enhancement on individuals who "us[e]," "carr[y]," or "posses[s]" firearms "during and in relation to" a "crime of violence." See *ante*, at 426. Section 924(c)(3)(A) then proceeds to define the phrase "crime of violence" as "an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another."

Today, the Court reworks that definition at the government's request. Now, the Court says, a "crime of violence" includes "the knowing or intentional causation of bodily injury . . . by omission." *Ante*, at 429. Under that approach, the government admits, even our lifeguard, whose offense stems from inaction, is guilty of a "crime of violence." Tr. of Oral Arg. 51. The only trouble is, nothing like the rule the government proposes and the Court adopts appears anywhere in § 924(c).

To appreciate how unlikely the Court's new rule is, just walk through the statute's key definitional terms, beginning with the word "use." When Congress adopted the current version of § 924(c) in 1984, the word "use" meant, as it does today, "to employ," "to convert to one's service," or "to avail one's self of." Black's Law Dictionary 1381 (def. 1) (5th ed. 1979); see also Webster's New Universal Unabridged Dictionary 2012 (def. 1) (2d ed. 1983) (similar). As this Court has long recognized, "[t]hese various definitions of 'use' imply action." *Bailey* v. *United States*, 516 U. S. 137, 145 (1995); see also *Voisine* v. *United States*, 579 U. S. 686, 692–693, and n. 3 (2016) (collecting cases). And because "use" has an "active meaning," one does not "use" something through mere "inacti[on]," "inert[ia]," or "nonactiv[ity]." *Bailey*, 516 U. S., at 148–149.

What must a person actively employ to commit a crime of violence? The statute tells us: "physical force."

§ 924(c)(3)(A). That is, "[f]orce applied to the body; actual violence." Black's Law Dictionary, at 1032. This Court explained as much in *Johnson* v. *United States*, 559 U. S. 133 (2010). There, the Court addressed the meaning of the phrase "physical force" in the definition of the term "violent felony" in § 924(e). "[P]hysical force," the Court held, does not reach "emotional" or "intellectual" force. *Id.*, at 138. Nor does it carry its "specialized meaning in the field of physics: a cause of the acceleration of mass." *Id.*, at 138–139. So letting a pre-existing force of nature run its course does not suffice. Instead, an individual must employ "[f]orce consisting in a physical act." *Id.*, at 139.

The "physical act" must also be a violent one. Again, consider *Johnson.* Because § 924(e) uses the phrase "physical force" to define what qualifies as a "violent felony," the Court in *Johnson* rejected the government's effort to equate the "physical act" required by the statute with the kind of "mer[e] touching" sufficient to establish the common-law crime of battery. *Id.*, at 139. Resort to common-law battery principles in this statutory scheme, the Court reasoned, would produce "a comical misfit." *Id.*, at 145. Instead, the Court ruled, the requisite "physical act" must be "*violent,*" which is to say "extreme" and "severe." *Id.*, at 140. And if that much follows when the phrase "physical force" is used to define a "violent felony" in § 924(e), surely the same must hold true when the same phrase is used in the same section of the U. S. Code to define a "felony" "crime of violence." § 924(c); see *Azar* v. *Allina Health Services*, 587 U. S. 566, 574 (2019).

Finally, the statute requires the use of force "against the person or property of another." Again addressing § 924(e), a plurality of this Court has recognized that similar language modifies the "volitional conduct (*i. e.*, the use of force)" discussed in the statute, and in doing so identifies the "conscious object" of a defendant's "use of physical force." *Borden* v. *United States*, 593 U. S. 420, 431 (2021). All of which sug-

gests that the statute before us captures only active violent force when it is knowingly or intentionally applied against the person or property of another. See *id.*, at 431–432.

Putting these pieces together reveals the implausibility of the Court's new rule. To commit a "crime of violence," an individual must (1) actively (not just through inertia) employ (2) a violent or extreme physical act (not a mere touching or pre-existing natural forces) (3) knowingly or intentionally to harm another person or his property. An individual who, as the Court puts it, "causes bodily injury by omission" does not begin to meet these criteria. *Ante*, at 429. Someone like our lifeguard may knowingly or intentionally cause another's death by refusing to fulfill his legal duty to act. Maliciously, he may choose to allow natural forces to take their toll. But by remaining in his chair, he does not actively employ even the merest touching, let alone violent physical force. Of course, crimes of omission like our lifeguard's are serious ones that can invite serious punishments under various state and federal laws. But § 924(c)(3)(A) was not written to reach every felony found in our Nation's many criminal codes. And the statute's terms simply cannot be stretched to cover crimes of "inact[ion]," "inert[ia]," or "nonacti[vity]." *Bailey*, 516 U. S., at 149.[1]

---

[1] Admittedly, trying to distinguish between acts and omissions can sometime prove a tricky business. See, *e. g.*, *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. 449, 469 (2017) (GORSUCH, J., concurring in part); 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.2, p. 273 (1986) (LaFave & Scott). But as I read this statute, that is a distinction Congress tasked us with drawing here. Nor is that the only line this statute requires us to respect, for even when it comes to active crimes § 924(c)(3)(A) reaches only a subset of them. So imagine, for example, our lifeguard, aware of deadly currents in the area, tricks a beachgoer into the water with a promise about its safety. The lifeguard's deceit might be an act rather than an omission, but his crime does not involve even a mere touching, let alone the use of violent physical force this statute demands.

GORSUCH, J., dissenting

## B

Not only does the Court fail to grapple with the statutory text, it breezes past the next best evidence of statutory meaning: context. As it turns out, several pieces of contextual evidence, all unmentioned by the Court, weigh against the notion that a § 924(c)(3)(A) "crime of violence" can include a crime of omission.

First, consider how informed readers understood the phrase in 1981. When Congress first considered defining "crime of violence" to require the "use of physical force against the person or property of another," legislators recognized that those terms would not reach omissions. S. Rep. No. 97–307, p. 591 (1981). A Senate report explained that the "operator of a dam [who] refuse[d] to open the floodgates during a flood, thereby placing the residents of an upstream area in jeopardy of their lives" would not commit a "crime of violence" since "he did not . . . use physical force." *Ibid.* Of course, "legislative history is not the law" and should not be confused for it. *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 523 (2018). But the report supplies at least some evidence that ordinary speakers at the time of § 924(c)(3)(A)'s enactment understood the phrase "use . . . of physical force" to exclude crimes of omission. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 388 (2012) (Scalia & Garner) (recognizing that courts may use legislative history "for the purpose of establishing linguistic usage").

Second, analyzing "how particular combinations of words are used in a vast database of English prose" can shed light on how ordinary people understand statutory terms. See *Facebook, Inc.* v. *Duguid*, 592 U. S. 395, 412 (2021) (ALITO, J., concurring in judgment). Just such a database—the Corpus of Contemporary American English—contains "forty-seven non-specialist instances of 'use of physical force.'" *United States* v. *Scott*, 990 F. 3d 94, 129, n. 8 (CA2 2021)

(en banc) (Menashi, J., concurring in part and concurring in judgment). Of those references, "all refer to physical contact; none plausibly refer to 'deriv[ing] service from' a preexisting physical force." *Ibid.* Thus the phrase "prototypically refers to assertive physical contact—'punches, kicks, slaps[,] and body slams.'" *Id.*, at 129.

Third, any other interpretation introduces redundancy into the statutory scheme. Section 924(c)(3) details two separate ways in which an offense may qualify as a "crime of violence." The first, the focus of our attention, is found in § 924(c)(3)(A), or what is sometimes called the elements clause. That provision addresses those felony offenses that have "as an element the use . . . of physical force against the person or property of another." The second, found in § 924(c)(3)(B), or what is sometimes called the residual clause, speaks to felony offenses that "by [their] nature, involv[e] a substantial risk [of] physical force." To the extent § 924(c) might address omission offenses, the residual clause is their natural home. It requires no active employment of physical force, only a risk some such force might be deployed. Expanding the elements clause to reach omission offenses, as the Court does today, goes a long way toward rendering the residual clause pointless. Perhaps the Court considers that outcome a virtue, given that we have held the residual clause unconstitutionally vague and thus unenforceable. *United States* v. *Davis*, 588 U. S. 445, 470 (2019). But conscripting one subsection to do the work no longer performed by another makes a hash of the separate and discrete provisions that Congress enacted.

Finally, a look to the broader federal criminal code reinforces what the statutory text suggests. Congress has exhibited no difficulty addressing omission crimes elsewhere, mentioning them explicitly in dozens of provisions up and down the U. S. Code. *E. g.*, 18 U. S. C. § 13(a) ("act or omission" is punishable); § 542 (similar); § 1166(b) (similar); 28 U. S. C. § 1346(b)(1) (similar). The fact that Congress

"knows exactly" how to reach omission offenses "when it wishes" to do so, yet declined to mention them in 18 U. S. C. §924(c)(3)(A), stands as one more piece of evidence yet that the statute covers only offenses involving the active use of force. *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 704 (2022).[2]

C

Where does (or should) all this leave us?  To determine whether a state offense qualifies as a crime of violence under the elements clause, a court must assess whether the offense "has as an element the use, attempted use, or threatened use of physical force" against another.  §924(c)(3)(A).  That assessment "does not require—in fact, it precludes—an inquiry into how any particular defendant may commit the crime."  *United States* v. *Taylor*, 596 U. S. 845, 850 (2022).  Were it otherwise and a sentencing judge could find facts about the defendant's underlying conduct, serious Sixth Amendment questions might follow.  See *Erlinger* v. *United States*, 602 U. S. 821, 833 (2024).

Now apply the elements clause's test to the New York statute at issue before us.  That law makes it a crime intentionally "to cause the death of another."  N. Y. Penal Law Ann. §125.25(1) (West 2009); see also *ante*, at 428, and n. 2.  Doubtless, New York's offense can be (and usually is) committed by affirmative actions involving the use of violent physical force.  But, the parties agree, New York's offense can *also* be committed by someone, like our lifeguard, who intentionally causes death by failing to fulfill a legal duty requiring him to act.  Brief for Petitioner 18; Brief for United States 8.  In cases like that, prosecutors can prevail simply by showing that a defendant did *nothing* when he had a legal

---

[2] In recognizing that Congress's choice of words in other statutes might inform the best reading of this one, I hew to familiar interpretive principles.  See, *e. g.*, *Astrue* v. *Ratliff*, 560 U. S. 586, 595 (2010) (majority opinion of THOMAS, J.) (same reasoning).  I do not, as the Court charges, invent a "clear-statement rule" for crimes of omission.  *Ante*, at 437.

duty to do *something.* And because a defendant can be convicted of the crime without proof that he used, attempted to use, or threatened to use physical force against anyone or anything at all, New York's offense cannot qualify as a crime of violence under § 924(c)(3)(A).

## II

The Court chafes at this conclusion. It emphasizes that Mr. Delligatti committed no mere crime of omission but instead plotted to use active force against his victim. *Ante*, at 426–428. On that much, there is no room for dispute. But neither is there room to dispute that § 924(c)(3)(A) focuses on the elements of New York's offense, not the particulars of Mr. Delligatti's crime. Some have criticized this feature of the elements clause, and their voices "could hardly be louder." *United States* v. *Harris*, 87 F. 4th 195, 212, and n. 25 (CA3 2023) (Jordan, J., concurring in denial of rehearing en banc) (collecting criticisms). But no amount of wishful thinking can change the nature of the inquiry that § 924(c)(3)(A) demands. See *Taylor*, 596 U. S., at 850.

Ultimately, the Court acknowledges as much. For New York's offense to qualify as a "crime of violence," the Court concedes, it must find some way to explain how committing that offense by omission requires the government to prove, as an element, the "use . . . of physical force." *Ante*, at 428, 433. To get there, the Court appeals to precedent, *ante*, at 429–433, and implicit congressional purposes, *ante*, at 436. But, unsurprisingly, our precedents do not require us to ignore the statute's terms. And no amount of conjecture about implicit congressional purposes can substitute for statutory text.

Start with the Court's argument from precedent. The Court asks us to believe that its hands are tied by *United States* v. *Castleman*, 572 U. S. 157 (2014), and *Stokeling* v. *United States*, 586 U. S. 73 (2019). Those two cases, the Court insists, require us to conclude that knowingly or inten-

tionally causing bodily injury by omission always "requires the use of force." *Ante*, at 429. So, as the Court tells it, even if the statute's terms might suggest a different result, respect for *stare decisis* compels the conclusion that New York's statute satisfies the elements clause. *Ibid.*

Notice, though, what's missing from the Court's account of precedent. While training its attention on *Castleman* and *Stokeling*, the Court neglects so many other relevant cases, relegating them to little more than an afterthought. *Ante*, at 438. Where is *Bailey*, and its holding that the term "use" in § 924(c)(1) carries an "active meaning," implying "action and implementation," not mere "inacti[on]," "inert[ia]," or "nonactivit[y]"? 516 U. S., at 145–149. Where is our precedent holding that the same word in the same law normally carries the same meaning—indicating that the term "use" in § 924(c)(3)(A) should be read the same way? See *Azar*, 587 U. S., at 574. Where are our decisions in *Leocal* and *Voisine*, interpreting "use" in other analogous contexts to mean "active employment," *Leocal* v. *Ashcroft*, 543 U. S. 1, 9 (2004), or "volitional conduct," *Voisine*, 579 U. S., at 693? Where is *Johnson*'s conclusion that the term "physical force" in § 924(e) excludes "its specialized meaning in . . . physics," requires more than "the merest touching," and cannot be equated with the common law of battery? 559 U. S., at 138–139. And where is *Taylor*'s admission that a "crime of violence" under § 924(c) "[p]lainly . . . requires the government to prove that the defendant took specific actions against specific persons or their property"? 596 U. S., at 856. Viewing our precedents as a whole leaves little question about how this case should come out. But, rather than engage with so many inconvenient cases, the Court largely ignores them.

Even examined in isolation, the two decisions the Court plucks out of the stack cannot begin to do the work the Court seeks to impress upon them. Take *Castleman* first. It involved § 922(g), which prohibits anyone convicted of a "misdemeanor crime of domestic violence" from owning a firearm.

By statute, Congress has defined the phrase "misdemeanor crime[s] of domestic violence" to reach certain offenses that have "as an element, the . . . use of physical force." §921(a) (33)(A)(ii). The question for the Court was whether a state domestic-assault statute making it a crime to "intentionally or knowingly caus[e] bodily injury" satisfied that definition. 572 U. S., at 161. The Court held it did. Because §922(g)(9) focuses on misdemeanor crimes of violence, the Court reasoned, it requires no more "physical force" than that required to establish a battery at common law—so "even the slightest offensive touching" will do. *Ante*, at 430–431 (quoting *Castleman*, 572 U. S., at 160–168). And, the Court held, the state offense at issue met that standard because it required proof of "force in the common-law sense." *Id.*, at 170.

Nothing in *Castleman* compels the conclusion that omission crimes involve "the use, attempted use, or threatened use of physical force" sufficient to implicate §924(c)(3)(A). Cf. *ante*, at 429–430. In fact, *Castleman* did not even *discuss* crimes of omission. And when the Court spoke of what it means to "use physical force," the Court spoke in active terms, stressing that the "knowing or intentional *application* of force is a 'use' of force." 572 U. S., at 170 (emphasis added). To be sure, the Court observed that a defendant may use physical force "indirectly, rather than directly." *Id.*, at 170–171. So, the Court explained, when a defendant "pull[s] the trigger on a gun," the defendant uses physical force even though the "bullet, not the trigger, . . . strikes the victim." *Ibid.* But from that, it does not follow that a defendant "uses physical force" when he does nothing. Cf. *ante*, at 429–433. Someone like our lifeguard stands worlds away from a shooter who indirectly "uses" a firearm's explosive force when he pulls the trigger.

To the extent *Castleman* has anything to say about our case, it does more to hurt than to help the Court's cause. To reach its holding that common-law battery informs the degree of physical force required by §922(g)(9), *Castleman* had

to distinguish *Johnson*, where the Court held that the degree of force associated with common-law battery does *not* qualify as the kind of "physical force" necessary to satisfy §924(e). 559 U. S., at 140; see Part I–A, *supra*. To distinguish *Johnson*, *Castleman* stressed that §922(g)(9) addresses "*misdemeanor* crime[s] of domestic violence," while §924(e) focuses on "*violent felon[ies]*." 572 U. S., at 163–164 (emphasis added). That difference, the Court reasoned, indicates the two statutes demand different degrees of force. *Id.*, at 164. Here, of course, we face a statute like §924(e), one addressing felony crimes of violence, not mere misdemeanors. And if, as *Johnson* held and *Castleman* recognized, a mere touching is insufficient to satisfy §924(e)'s "physical force" requirement, it is hard to imagine how complete inaction might fit the bill under §924(c)(3)(A).

With nothing in the *Castleman* majority opinion to help it, the Court eventually turns to Justice Scalia's solo concurrence. *Ante*, at 430–432. There, he rejected the majority's suggestion that a slight touching qualifies as the "use of physical force" even under §922(g). 572 U. S., at 173–175 (opinion concurring in part and concurring in judgment). The common-law battery standard, he said, plays no role in a statute that does not reference it. *Id.*, at 176. Instead, the author of *Johnson* explained that he read the phrase "physical force" in both §922(g) and §924(e) to mean what *Johnson* said it means: "violent force—that is, force capable of causing physical pain or injury." 572 U. S., at 174 (quoting *Johnson*, 559 U. S., at 140; emphasis deleted). Even so, Justice Scalia concurred in the judgment because the state statute at issue in *Castleman* required proof that the defendant "cause[d] bodily injury," and, in his view, "it is impossible to cause bodily injury" without employing the kind of violent force *Johnson* discussed. 572 U. S., at 174.

That syllogism is of no use to the Court here. Justice Scalia may have claimed that a defendant whose *actions* cause bodily injury necessarily uses violent physical force.

*Ibid.* But he did not claim that a defendant whose *failure to act* causes bodily injury also necessarily uses violent physical force. Quite the opposite. "[N]onphysical conduct" like "acts of omission," Justice Scalia said, cannot "possibly be relevant to the meaning of a statute requiring 'physical force.'" *Id.*, at 181 (emphasis deleted; some internal quotation marks omitted). By rejecting the notion that omissions resulting in bodily injury can give rise to liability under statutes like the one before us, Justice Scalia stuck to his view in *Johnson* that the phrase "use . . . of physical force" captures only "'a category of violent, *active* crimes.'" 559 U. S., at 140 (quoting *Leocal*, 543 U. S., at 11; emphasis added). And it is a view directly at odds with the Court's decision today.

Finding *Castleman* a dry hole, the Court prospects *Stokeling*. *Ante*, at 431–432. But the Court does so only briefly, and understandably so. *Stokeling* held that the phrase "physical force" in § 924(e) "includes the amount of force necessary to overcome a [robbery] victim's resistance." 586 U. S., at 87. That amount of force, the Court explained, does not encompass "the merest touching," *id.*, at 83, or simply "snatching of property from another," *id.*, at 86, but requires more "physical contact," *id.*, at 83. How any of that helps the Court today mystifies. Our case does not present a question about robbery or purse snatching, and nothing in *Stokeling* begins to address the question whether a crime of omission entails the "use . . . of physical force." More than that, *Stokeling*'s statements about the degree of force required to satisfy § 924(e) indicate that something beyond mere inaction is required.[3]

_____
[3] Later in its opinion, the Court returns to *Stokeling* and suggests it means that any force actively but "indirectly" applied to another—such as robbing an individual after "slipping a sedative into [his] coffee"— qualifies as the use of violent physical force if it results in some bodily injury. *Ante*, at 437. But *Stokeling* said nothing of the kind. It did not

## III

Unable to ground its decision in precedent, the Court retreats, at the tail end of its opinion, to an argument about statutory purpose. *Ante*, at 435–436. The argument runs this way. The Court observes that some notable crimes at common law, including murder and battery, required prosecutors to prove only that the defendant, with a particular *mens rea*, caused a particular result (*e. g.*, death or bodily injury), whether by affirmative action or by failing to fulfill a legal duty that required him to act. Offenses like that are sometimes called "cause and result" crimes. See 1 La-Fave & Scott § 3.3, at 283, 293–294. Many contemporary statutes, the New York murder statute before us among them, follow this common-law pattern. And, on the Court's theory, if § 924(c)(3)(A) failed to reach significant cause-and-result crimes like murder and battery simply because they can be committed by omission as well as by act, the statute would not adequately serve its purpose of addressing "crimes of violence." *Ante*, at 435–436. I am not blind to the appeal of the argument, but I find it unpersuasive for a couple reasons.

---

discuss "indirect" applications of force, sedatives—or coffee. Instead, that decision addressed a state robbery statute demanding proof, as an element, that the offender's "physical force" overcame "resistance by the victim." 586 U. S., at 76 (internal quotation marks omitted). And *that* offense, the Court held, falls within the "category of violent, active crimes" embraced by § 924(e). *Id.*, at 83. Nor could *Stokeling* have sensibly said what the Court now supposes. The truth is that some acts involve the use of violent physical force and others do not, regardless whether those acts directly or indirectly cause bodily injury. So, as we have seen, pulling the trigger of a gun involves the indirect application of violent physical force. *Supra*, at 448. But that hardly means pulling the trigger of a nerf gun, using the force of the coiled spring to expel a projectile, does too— even if striking someone with it causes a bodily injury. In any event, whatever *Stokeling* did (or did not) say about crimes involving the active but indirect application of force, it said precisely nothing about crimes of omission where the defendant does nothing at all.

A

For one thing, there can be little doubt about what the argument is: a resort to unexpressed legislative intentions. Congress, the Court insists, could not *possibly* have used the phrase "crime of violence" in § 924(c)(3)(A) without intending to capture "prototypical" cause-and-result crimes, like murder and battery, long recognized at common law. See *ante*, at 436.

We have no business entertaining an argument like that. In § 924(c)(3)(A), Congress did not ask us to plumb the legislative mind or to do whatever it takes to ensure the statute reaches certain cause-and-result crimes familiar to the common law. Instead, Congress told us exactly what qualifies as a "crime of violence" for purposes of this law: an offense that has "as an element" the "use, attempted use, or threatened use of physical force." § 924(c)(3)(A). And, as this Court has often explained, when Congress takes the trouble to supply an express definition, we are obliged to treat it as "virtually conclusive," even—and perhaps especially—if it "varies" from what we might otherwise understand (or wish) the definition to be. See *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 59 (2024); Scalia & Garner 228 ("It is very rare that a defined meaning can be replaced with another permissible meaning of the word . . . ").

The Court offers no persuasive answer to any of this. To be sure, the Court protests that it merely seeks to give voice to the "conventional meaning" of the phrase "crime of violence." *Ante*, at 438. But the Court's focus on that phrase in isolation, followed by an insistence that it must capture common-law cause-and-result crimes like murder and battery—all without any serious attention to the express definition Congress gave us or so much contextual evidence about its meaning—leaves little room for doubt that purpose, not text, is in the driver's seat today.

In saying that much, I do not mean to suggest courts may never look to the common law to inform statutory text. Sometimes, courts properly consider the common law when interpreting a term of art Congress has adapted from that "old soil." See, *e. g.*, S*ekhar* v. *United States*, 570 U. S. 729, 733 (2013). And, yes, we may sometimes resort to the common law when a statute leaves a gap (say, by failing to supply a burden of proof or the requisite *mens rea*). See, *e. g.*, *Morissette* v. *United States*, 342 U. S. 246, 262 (1952).

The trouble is, we have nothing like that here. Before us is an express statutory definition that bears no resemblance to traditional common-law terms and leaves no gap to fill. The Court does not claim otherwise. Nor could it, for we have been down this road before. In *Johnson,* the government asked this Court to draw from common-law liability principles to inform parallel statutory language in § 924(e). The Court refused that request because it threatened to generate only a "comical misfit." 559 U. S., at 145; see also *Castleman*, 572 U. S., at 175 (opinion of Scalia, J.) ("expansive common-law" principles cannot displace the "statutory text" of § 924(e)).

The same holds true here. By looking to the common law today, the Court produces a serious misfit. At common law, an omission could give rise to liability for a cause-and-result crime only if the defendant had a well-defined legal duty to act (think of a doctor's duty to his patient, or a father's duty to his child). See 1 LaFave & Scott § 3.3, at 283. Yet the Court's reading of § 924(c)(3)(A) renders the presence of a legal duty irrelevant—as the Court sees it, knowingly or intentionally causing bodily injury by failing to act is *always* a "crime of violence." *Ante*, at 429. In the name of revising this statute to better track common-law cause-and-result crimes, then, the Court (ironically) expands the frontiers of criminal liability in ways utterly unknown to the common law.

Along the way, the Court hands us another misfit, too, this one having to do with our own precedents. In *Johnson*, the government asked the Court to read the phrase "physical force" in a statute addressing "violent felon[ies]" to reach mere touchings consistent with the common law of battery. See 559 U. S., at 140. Here, the government goes a step further, asking us to read the phrase "physical force" in a statute addressing "felony" "crimes of violence" to embrace common-law cause-and-result crimes (including battery) where not even a mere touching is required. How the Court might reject the first request and indulge the second poses quite the puzzle. If there is some way to reconcile today's decision with *Johnson*, the Court never explains what it might be.

## B

Not only do we have no business guessing about unexpressed legislative intentions. Even were we to play that game, the Court's intuition that Congress must have wanted § 924(c)(3)(A) to reach "prototypical" cause-and-result crimes might well be wrong.

Consider a little more closely the concern the Court asks us to ascribe to Congress. The Court cannot really suppose that Congress wanted us to ensure that cause-and-result crimes committed by omission qualify as "crimes of violence" under § 924(c)(3)(A). After all, omission offenses would trigger a sentencing enhancement under § 924(c)(1) only in the most unusual circumstances. Just ask yourself: How would our spiteful lifeguard "us[e]," "carr[y]," or "posses[s]" a firearm during and in relation to his crime of inaction? § 924(c)(1)(A).

Really, the Court's argument must rest on a different assumption. It must rest on a view that Congress implicitly wanted § 924(c)(1)'s sentencing enhancements to apply to cause-and-effect crimes, like Mr. Delligatti's, where an individual uses, carries, or possesses a gun to commit a violent *act* that causes bodily injury. *Ante*, at 435–436. To ensure

that § 924(c)(1) does its intended job of reaching *those* "proto-
typical" crimes of violence, the Court goes big.   It asks us to
accept the (implausible) notion that cause-and-result crimes
resulting in bodily injury always, even when committed by
omission, require the government to prove as an element "the
use . . . of physical force."   § 924(c)(3)(A); *ante*, at 435–436.

But even if Congress implicitly wanted § 924(c)(1)'s sen-
tencing enhancements to reach cause-and-result crimes that
are committed by act and cause bodily harm, there is no rea-
son to suppose Congress wanted us to mangle § 924(c)(3)(A)
to get the job done.   Recall that § 924(c)(1)'s sentencing
enhancements apply to a "crime of violence" as that phrase
is defined *either* in the elements clause before us
(§ 924(c)(3)(A)) *or* in the residual clause (§ 924(c)(3)(B)).   See
Part I–C, *supra*.   By its terms, the latter clause "sweeps
more broadly."   *Davis*, 588 U. S., at 467 (internal quotation
marks omitted).   It does not require an examination of the
elements the government must prove to secure a conviction,
let alone demand that those elements require proof of the
use of physical force.   Instead, the residual clause reaches
offenses that, in "ordinary" cases, pose a "risk of physical
injury."   *Id*., at 452 (quoting § 924(e)(2)(B)(ii)).   And Con-
gress might well have thought the residual clause the more
natural home for cause-and-result crimes like murder and
battery, for even if those offenses do not require the govern-
ment to prove as an element the use of physical force, as
committed those offenses typically involve physical force
(and certainly the *risk* of it).

Equally, Congress might have had another idea in mind.
Maybe Congress did not mean for § 924(c)(1) to reach all
murder and battery offenses.   Maybe Congress wanted
§ 924(c)(1) to reach only those murder and battery offenses
that require the government to prove, as an element, the use
of physical force—or that, by their nature, involve a substan-
tial risk of such force.   After all, States write their criminal
laws in different ways.   And, doubtless, some states draft

some murder and battery statutes to focus on the degree of force a defendant uses, not just the result he brings about. Maybe Congress homed in on offenses like that, not all murder and battery crimes, because it thought those offenses especially deserving of additional punishment. See, *e. g.*, 18 U. S. C. § 1111(a) (murder involving the torture of a child).

That possibility seems all the more likely because § 924(c)(1)'s enhancements are not the be-all and end-all of federal sentencing. Even when § 924(c)(1)'s enhancements do not apply, sentencing courts enjoy ample tools to ensure a defendant's punishment fits his crime. And that's nowhere truer than when it comes to those who commit serious crimes like murder and battery. In this respect, Mr. Delligatti's case is illustrative. The district court sentenced him to 25 years in prison—20 years for his offenses related to attempted murder, plus 5 additional years under § 924(c). See Judgment in No. 15–491 (SDNY, Aug. 20, 2018), ECF Doc. 729, p. 3. But even without a § 924(c) enhancement, the advisory guidelines suggested, and the judge was free to impose, a sentence of up to 28 years. See Sentencing Submission for United States, ECF Doc. 712, at 10–14; accord, App. to Pet. for Cert. 28a. The judge, too, was free to depart or vary from the recommended guidelines range to impose an even harsher sentence had she deemed it appropriate. See 18 U. S. C. § 3553(b).

Nor would recognizing that § 924(c)(3)(A) fails to reach Mr. Delligatti's offense guarantee him some windfall. Doing so would leave the district court free, on remand, to impose exactly the same sentence it did the first time around, or maybe even a harsher one yet. See *Dean* v. *United States*, 581 U. S. 62, 69 (2017). Nothing about Mr. Delligatti's case is unique either. With or without a § 924(c)(1) enhancement, those convicted of serious offenses in our federal criminal justice system routinely face serious sentences and judges amply equipped with the means to issue them.

GORSUCH, J., dissenting

\*

In the end, the Court's decision today comes up short on every count. It neglects § 924(c)(3)(A)'s definitional terms and their ordinary meaning. It ignores important contextual clues. It leans heavily on only two, ultimately unhelpful, precedents without addressing others. And it resorts to conjecture about implicit congressional purposes that is unconvincing on its own terms. To my mind, none of the Court's arguments can overcome the hard fact that crimes of omission do not involve the "use . . . of physical force against another." Individuals like our lifeguard who commit offenses by omission may face punishment under many other criminal laws, but § 924(c)(3)(A) does not reach them. Even if a reasonable doubt remained about that common-sense conclusion (I confess I harbor none), the rule of lenity would require us to reach the same result anyway. See *Bittner* v. *United States*, 598 U. S. 85, 101 (2023) (opinion of GORSUCH, J.). For all these reasons, I respectfully dissent.

Page Proof Pending Publication

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 456, line 3: "honed" is changed to "homed"
p. 457, line 2 from bottom: "(opinion of Gorsuch, J.)" is inserted after "(2023)"